Harmony Electric Company, Appellant, v. The Public Service Commission of the Commonwealth of Pennsylvania.

Argued March 13, 1930.

72

■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■

*David I. McCahill,* of *McCahill & Tabor,* and with
him *Berne H. Evans,* of *Hause, Evans & Baker,* for
appellant.

*William A. Magee,* and with him *Charles A. Fagan,
Jr.,* and *Harold F. Reed,* for intervening appellee.

*E. Everett Mather, Jr.,* and with him *Daniel H.
Kunkel,* Legal Assistant, and *John Fox Weiss,* Coun-
sel for the Public Service Commission of the Common-
wealth of Pennsylvania.

Opinion by Linn, J., April 18, 1930:
The appellant, Harmony Electric Company, supplies
electric energy (1) for lighting, (2) for operating two
inter-urban street railways, and (3) for industrial pur-
poses; the first producing about 23% of its revenue,
the second about 37%, and the third about 40%. From
1922 to May, 1927, the rates for industrial power were
filed in three schedules B, D, and E. Appellant's oper-
ations are conducted in four counties: Allegheny, But-
ler, Beaver and Lawrence. In 1927, it filed a new
schedule—identified as H—increasing its rates for in-
dustrial power, and intended to supersede schedules B,
D, and E. Before the effective date of the new tariff.

complaints were filed by industries and by a municipality, charging that the proposed rates would be unreasonable; issue was joined; the complaints were consolidated; evidence was taken and a report was filed in which the commission held that appellant, which had the burden of proof (Act V, section 4, 1913, P. L. 104) had not sustained it; the commission accordingly ordered into effect the industrial power rates theretofore prevailing—schedules B, D, and E. That action is the principal ground for these appeals and shall be disposed of first. No question of confiscation is raised.

1. The evidence shows that appellant has been and is operating successfully. For the three years preceding this increase in the industrial rates, the following account (taken from intervening appellee's brief and not challenged by appellant) shows the book value of the property used in the public service and the operating income. In 1926 the kilowatt-hour sales and the revenue derived from the sales of the three classes of power were as follows:

|  | K. W. H. | Revenue |
|---|---|---|
| Domestic Lighting | 1,219,731 | $129,380.81 |
| Industrial Power | 12,170,711 | 221,040.27 |
| Railways (estimated) | 15,577,685 | 208,919.84 |
|  |  | $559,340.92 |

For three years previous to 1927 the book value of plant, including fixed capital, materials, supplies and cash, (after deduction of depreciation reserve) and the operating income were as follows:

|  | Value of Plant | Operating Income | Return |
|---|---|---|---|
| 1924 | $519,209.76 | $99,030.78 | 19% |
| 1925 | 558,066.89 | 116,727.78 | 21% |
| 1926 | 464,081.62 | 134,851.84 | 30% |

Appellant's officers testified that they estimated to result from the new rates an increase in revenue any-

where from \$35,000 to \$70,000, though "nearer \$70,000 a year ......." There is definite evidence of the motive for the new tariff. A witness, who is secretary and treasurer of the company, was asked: "Why did the company think it needed more revenue?" and replied—"Well, we were—I think the Railways Company had been losing money, and the power—the industrial consumers, their rates were considerably lower than any of the other companies in the district —that the additional revenue that we would get from the power consumers, which we were only asking them to bring up to even lower than what the other companies were charging—would put the companies in better standing. Q. You could not afford to make any increase in the railway revenue then? I mean, you could not afford to make any increase in the charge against the railway companies, could you? A. No. We tried it."

This expression of purpose to recoup losses sustained by the railway companies, by increasing industrial power rates, brings us to a necessary statement of somewhat complicated inter-corporate relations—existing when the evidence was taken—an understanding of which will make it obvious that the commission could have reached no other conclusion than that appellant has not produced satisfactory evidence that the new industrial rates were reasonable.

All the capital stock of appellant (par \$25,000) is owned by the Pittsburgh, Harmony, Butler and New Castle Railway Company, (hereinafter called Harmony road), and by it, is pledged under a deed of trust made for the benefit of Harmony road. Substantially all of the capital stock of the Harmony road and also the capital stock of another railway company—the Pittsburgh, Mars and Butler Railway Company (hereafter called Mars road) is owned by Peoples Power Company. All of the capital stock of Peoples Power Company is owned by Pittsburgh, But-

ler and Harmony Consolidated Railway and Power Company, which the witnesses describe as a holding company. These five corporations have the same officers and management. By means of these corporations the lighting, power and railway operations were conducted as a unit, the operating costs and the revenue received being charged and allocated in accordance with the fact where apparent, by estimate in some cases, and perhaps, arbitrarily, in others. The unitary character of operation and management may be gathered from the following concession made in appellant's brief: "The charges to be made against each of the companies for such use as such company might make of the facilities of the other companies was not established, [by appellant's evidence], nor could it be established, except by the making of an estimate which could be nothing more or less than purely guesswork, and so long as these facilities are jointly used, nothing more than an estimate could be made of the amount which should be apportioned against each company for the use of the facilities of some other company." A considerable mileage of high voltage transmission lines is involved; of these, some are owned by appellant; some by appellant and the Harmony road jointly; some by Peoples Power Company; some by Mars road; numerous sub-stations owned by one or other of the companies and many distribution lines and other property are in use. No power is manufactured by any of these companies; it is purchased by Peoples Power Company and delivery is taken at two stations, one on the Pennsylvania-Ohio state line, and the other at Ellwood City, Pa. At one station the delivery is direct to appellant, though the power is billed to and paid for by Peoples Power Company, this company, however, treating itself as seller to appellant, which, in turn, distributes. And though the law requires it, (Johnsonburg v. Pub. Serv. Commission, 98 Pa. Superior Ct. 284) Peoples Power

Company has on file no tariff providing a rate for the sale of the power to appellant, the price being treated as an inter-company matter. As a result of the failure to use meters for the purpose of measuring the power sold by appellant to the Harmony road and to the Mars road, their purchase of power is estimated and payment made according to the estimates. While appellant pays no rent for sharing in the use of the transmission lines owned by the two railways, the record shows that at the end of 1926, it was creditor by "accounts receivable from consumers" in one sum of $304,538.99, which we were informed at the oral argument represented the indebtedness of Harmony road to appellant for power; in addition at the same date, there was another item of $66,801.36 carried as due by "affiliated companies," making a total of $371,341.35 then carried on appellant's books, which had reached that amount by annual increases during the four years shown on Exhibit U in evidence.

Returning, now, to the time when the preparation of Schedule H was under discussion by the officers of these companies, the evidence is, that for the purpose of recouping the railway losses and bringing up power rates that were deemed too low, the officers called into conference two men—said to be familiar with the subject—and considered the rates of three other power companies operating in Western Pennsylvania. The president of appellant testified that the structure of, and the rates in Schedule H, were recommended by these two men and were adopted "as a rate which would not be prohibitive and at the same time would return a revenue." He also said that they took into account costs of operation but "we did not take into account rate of return because we did not have any definite figures as a rate-base." He did not give the details of the costs considered and rather minimized that element in adopting the rate by his answer to this question—"Q. Then it looks as if your demand

charge must have been reached by a comparison with the three neighboring companies? A. Largely, as I said before." He also repeated that answer in cross-examination.

A study of the evidence leaves no doubt that in substance the parties reasoned thus: "Our railway business is losing money; our industrial rates are too low when compared with those of the three other companies, (to be mentioned presently); in the interest of the treasury of the holding company to which the profits of all the affiliated subsidiaries ultimately go, we shall increase the power rates to recoup the losses made in the operation of the street railways."

Now, there would perhaps be no legal objection to that position, if the increase were justified by the facts found after careful scrutiny of the inter-corporate relations reflected in the various operations of each company: see Houston v. Southwest Tel. Co., 259 U. S. 319, 323; Southwestern Tel. Co. v. Mo. Com., 262 U. S. 276, 288; U. S. Gas Company v. Railroad Com., 278 U. S. 300; Johnsonburg v. P. S. C., supra. It offered no evidence of the value of its property used in the service; and the commission had nothing before it which might take the place of such evidence; compare Kittanning Tel. Co. v. Pub. Serv. Com., 78 Pa. Superior Ct. 436; St. Clair Coal Company v. Pub. Serv. Com., 79 Pa. Superior Ct. 528, 535; see also Phila. v. Pub. Serv. Com., 83 Pa. Superior Ct. 8; New Street Bridge Company, 271 Pa. 19, 38. But having adopted its new rates in the light of the tariffs of three other companies, it now proposed to prove them reasonable by an attempted comparison with the rates of those three companies. Comparison involves examination of two or more things for the purpose of determining like and unlike elements. Appellant called a witness, (one of the two advisers referred to above) who testified that he was familiar with appellant's operations and the communities and territory in which they were

conducted, and also with the operations of three other companies doing business in Western Pennsylvania: the West Penn Power Company, the Penn Public Service Corporation, and the Pennsylvania-Ohio Power and Light Company. His evidence, as we understand it, comes to this: that the average cost of the service rendered by any of these three companies was less than appellant's cost for rendering its service generally; but obviously, that falls far short of supporting a conclusion that the like elements in the subjects of comparison were general, and the unlike ones immaterial, in reaching the result desired; it does not appear that appellant's service was rendered in circumstances substantially similar to those in which any of the other three companies rendered theirs; on the contrary, essential differences appeared; see Smyth v. Ames, 169 U. S. 466, 540.

While the expert witness said that appellant's costs were higher than those of the three companies used in the comparison, and while appellant's officers said they considered their costs in making the new rates, the record is destitute of such evidence as the commission was entitled to have, to show how appellant determined its costs. The inter-corporate relations may have made proper distribution of expenses debatable, but if necessary to show the ultimate fact, the evidence should have been produced in its most available form. This omission is concisely stated in appellee's brief as follows: "Respondent [appellant] at no time offered evidence as to the revenues and expenditures connected with the service of the industrial class, per se; it offered no evidence showing allocation of costs as between the industrial, domestic and railway services; it offered no evidence showing any relationship between the expenditures of its three classes of consumers and the revenue derived therefrom; it offered no evidence allocating expenditures of jointly used facilities between it and its associated utility corpo-

rations beyond a proportioning of the gross expenditures of two of the four. Although the record is very voluminous, it is as bare of true cost accounting, under recognized utility practice as it is bare of data that would permit a calculation of a fair return."

2. After the report of the commission was filed on January 9, 1929, appellant filed a petition for reopening and reconsideration of the case, averring that since the proceeding began, but prior to its completion, "the ownership of the entire issued and outstanding stock of your petitioner has changed, and your petitioner no longer has any connection, either directly or indirectly, with the street railway companies mentioned in the report ...... At the same time, with the approval of this commission, the ownership of the physical properties involved in the proceeding has been definitely established. The result is that your petitioner is in a position to meet the objection of the commission contained in its report wherein it states that respondent presented 'no consistent basis for the apportionment of the properties and operating costs between the various companies.' Your petitioner therefore represents to the commission that it is now in a position to show to the commission that the rates complained against are just and reasonable by proper allocations of the cost of service and to prove to the commission that the former rates, re-established by the order of the commission, are, and at all times have been, unjust and unreasonable and unduly low. Because of these changes in conditions, which make it possible to prove the necessary facts without apportionments or surmises, the respondent respectfully prays that this case be reopened and it be given an opportunity to present the facts as they exist at the present time for consideration of the commission." This petition was refused after consideration.

The refusal to reopen the case in the circumstances stated does not seem to us to have been wrong. The

original proceeding began by complaint filed early in May, 1927, hearings began October 13, 1927, and continued until March 9, 1928. The petition does not state when the ownership of the stock of appellant changed hands, nor is it apparent why the evidence which petitioner stated would be available on re-hearing, was not available at all times during the hearing. We are not impressed by the argument on this assignment of error. Nor do we sustain the assignment complaining that the commission ordered in the industrial rates that had been effective from 1922 up to the time schedule H became effective. The commission, of course, might have conducted an investigation of its own, and, pursuant thereto, fixed industrial power rates or ordered appellant to file a schedule within a given maximum, but the statute does not require it in the circumstances disclosed. The appellant may at any time file a petition with the commission for leave to file a tariff of such rates, (Act II, Sec. 1-f, 1913, P. L. 1379) which the commission will hear and dispose of; see Kittanning Tel. Co. v. P. S. C., 78 Pa. Superior Ct. 436.

3. After the commission had filed its report, it was discovered that, by some inadvertence, schedule D had been omitted from the order; an amendment to the order was therefore made by the commission pursuant to a petition therefor, supplementing the original order by adding schedule D to it. In its answer to that petition, objecting to the amendment, appellant averred that the order made was "unreasonable, unjust and unlawful in that it reinstates these discriminating rates and compels respondent company to continue a practice which it desires to desist from in order that it may comply with the Public Service Company law." This answer contained a prayer for affirmative relief as follows: " ...... prays that the commission modify its original order in this case, in which order it did not find the reasonable rate for the service in-

volved, and that it direct the respondent company to file a new tariff for commercial and industrial power establishing a uniform, non-discriminatory and reasonable rate for this service which shall be less than schedule 'H,' the reasonableness of which the commission has found that the respondent has failed to prove.'' Appellant may of course proceed under Article II, Sec. 1-f, supra. We see no reason for differing from the conclusions of the commission.

Order affirmed and appeal dismissed.