Yellow Cab Company et al., Appellants, *v.* Pennsylvania Public Utility Commission et al.

42

Argued April 23, 1947. Before RHODES, P. J., HIRT, RENO, DITHRICH, ROSS and ARNOLD, JJ.

*H. E. McCamey* and *Gilbert Nurick,* with them *Dickie, Robinson & McCamey* and *McNees, Wallace & Nurick,* for Yellow Cab Company appellant.

*M. Barney Cohen,* for intervenor, appellant.

*Charles E. Thomas,* with him *William McKelvy Rutter,* for Public Utility Commission appellee.

*Elder W. Marshall,* with him *Mayer Sniderman, D. I. McAllister and Reed, Smith, Shaw & McClay,* for applicant intervenor, appellee.

OPINION BY RHODES, P. J., July 17, 1947:

This is an appeal by the Yellow Cab Company of Pittsburgh from an order of the Pennsylvania Public Utility Commission entered February 18, 1947, (1) approving an application of Peoples Cab Company, Inc., for approval of its incorporation, organization and creation; (2) approving an application of the said applicant for a certificate of public convenience authorizing transportation as a common carrier of persons upon call or demand in the city of Pittsburgh, Allegheny County; and (3) registering on application a securities certificate of said applicant which proposed the issuance of 25,000 shares of stock of no par value "with a fixed nominal value of One ($1.00) Dollar per share."

The applications were protested by the Yellow Cab Company of Pittsburgh and the Pittsburgh Transportation Company, which at that time operated under unified management, and subsequently, at the direction of the commission, were merged into the Yellow Cab Company of Pittsburgh.

The proceedings were consolidated for the purpose of hearing, and extensive hearings were held.

On January 22, 1946, the commission on its own motion instituted an inquiry and investigation against the Pittsburgh Transportation Company, the Yellow Cab

Company of Pittsburgh, and the McKees Rocks Taxicab Company to inquire into and investigate the taxi service and facilities in Pittsburgh and vicinity, and to determine whether the respondents were furnishing adequate, efficient, and reasonable service and facilities as required by the Public Utility Law. After hearings in that proceeding, the commission, on August 21, 1946, entered its order in which it found that the Pittsburgh Transportation Company and the Yellow Cab Company of Pittsburgh were, in effect, a single corporation, and ordered them to merge into the Yellow Cab Company of Pittsburgh. The commission also found that both the quality and quantity of taxicab service furnished by these two companies was "wholly inadequate to meet the demands of the public." The commission in its order gave a comprehensive review of the history of the taxicab service furnished by these companies in the city of Pittsburgh, set forth the reasons for the inadequacy of the current service, and discussed ways and means by which it could be remedied. The commission, with a view to improving conditions, directed in its order that these companies augment their combined fleets of taxicabs by the purchase of new cabs, replacing their existing dilapidated, worn out and obsolete equipment, and adding more cabs to their existing fleets to the end that they might be in a position to render the service which they are obliged to render under their certificates of public convenience; that they keep records of the number of telephone requests for service received each day, and the number of such requests actually serviced; that they install two-way high frequency audible radio communication equipment in at least five cabs of the combined fleet; and that they establish two additional garages to be located in the north and south districts, respectively, in the city of Pittsburgh. This order of the commission expressly set forth: "We do not decide in this proceeding whether any additional certificates should be granted in this territory." The order of the commission in the

proceeding entered by the commission on its own motion was incorporated by reference into the present record, as well as certain testimony and exhibits presented in that proceeding.

The commission's order of February 18, 1947, from which the Yellow Cab Company of Pittsburgh has appealed, makes the following summation: "After full consideration of the record in this proceeding, we have concluded and therefore find (1) that call and demand or taxicab service as presently available in the City of Pittsburgh is inadequate; (2) that Peoples Cab Company, Inc., has established that a public need exists within the City of Pittsburgh for service as contemplated by the application of Peoples Cab Company, Inc. . . ."

We have frequently said that the filling of an existing need in transportation facilities is an administrative question to be determined by the commission, and that its decision, if based on competent and relevant evidence, will not be disturbed by this Court unless it is so capricious, arbitrary, or unreasonable as to amount to error of law or a violation of constitutional rights. *John Benkart & Sons Co. v. Pennsylvania Public Utility Commission*, 137 Pa. Superior Ct. 13, 16, 17, 7 A. 2d 588; *Colombo et al. v. Pennsylvania Public Utility Commission*, 159 Pa. Superior Ct. 483, 487, 48 A. 2d 59. There is no question about the need of improved or additional service within the city of Pittsburgh.

Appellant's defense to the commission's finding that the service rendered by it is inadequate is in the nature of a plea in confession and avoidance. Appellant contends that any inadequacy of service rendered by it was due to wartime controls, material shortages following the war, and conditions beyond its control generally; that the only evidence as to necessity for additional service was predicated upon shortcomings arising out of wartime and extraordinary conditions; and that such evidence does not constitute a proper basis for the finding of inadequacy in the existing service.

There is ample evidence in the record to support the finding of inadequacy of service; and this evidence covers service both during and after the war years, and particularly at the time of the various hearings. Many witnesses appeared and testified on behalf of Peoples' application to the inadequacy of existing service under appellant.

It is conceded that 50 per cent of the telephone calls received by appellant during the war years were not serviced, that is, the person requesting service canceled the call because he could not wait the required time. No discussion relative to the inadequacy of the service during that period is required. Witnesses testified that since the war, when calling a taxicab, they were told that they would have to wait two, three, or even four hours. In one instance, a nurse who had a special case in the hospital called for a taxicab to take her to the hospital, making the call every morning for six weeks without ever receiving service. Witnesses testified as to specific instances where appellant refused service on emergency telephone calls, and refused to take such orders for taxicabs although they were to be found idle at stands. There was testimony that appellant refused at times to accept passengers, and there were instances given where passengers were obliged to alight before they had reached their destination. The voluminous testimony disclosed a clear picture of inadequacy of existing service, and this is not seriously controverted by appellant.

The commission's order of August 21, 1946, summarized testimony presented in the investigatory proceeding which further describes the general inadequacy of appellant's service. Referring to the testimony of Honorable David L. Lawrence, Mayor of the City of Pittsburgh, the order sets forth that he testified that "There is a deep dissatisfaction with both the quality and the quantity of taxicab service" in Pittsburgh, and that "He stated that service is subject to long delay and

that requests for service to outlying districts of the city is refused by taxicab drivers. He deplored the lack of special provisions for emergency calls to hospitals and other special needs and decried the practice of taxi drivers cruising the streets in the business and amusement areas. He recognized that many of the deficiencies of taxicab service in Pittsburgh had their origin in wartime conditions, but stated that a primary cause of the inadequate service was the small number of cabs in prewar service; in his opinion the service having been geared to depression times. He suggested, as remedial measures, that the number of cabs in operation be increased, and that rationing of taxicab service be initiated."

That order also refers to the fact that Mr. Abraham Oseroff, Secretary of the Hospital Council of Western Pennsylvania, appearing on behalf of 26 hospitals in Pittsburgh and vicinity, testified that during the war period service was inadequate and the employees of the taxicab companies were lacking in courtesy; and that since the war there has been some improvement, but the service was far from fully adequate for the needs of hospital patients. The order referred to the testimony of Mr. Charles S. Gormley, Manager of the Transportation Division of the Chamber of Commerce of Pittsburgh, who stated that "The present number . . . of cabs operating in the city . . . is entirely inadequate to take care of the business offered and has been for at least three years." Reference is also made to the testimony of Mr. Donald M. McNeil, Traffic Engineer of the Department of Public Safety of the City of Pittsburgh, who testified that taxi service in Pittsburgh was inadequate between 1940 and 1945, and remained inadequate. The order further set forth that there was considerable evidence presented that a large portion of appellant's fleet engaged in cruising the streets in the downtown city area in violation of a city ordinance, and that this practice caused traffic congestion in a crowded area, and

operated to deprive the outlying districts of the city of adequate service.

The record in the present case shows that in 1940 appellant had 250 taxicabs in operation. In September, 1942, when the Office of Defense Transportation froze the size of appellant's fleet it consisted of 265 vehicles in operation with 35 in storage; the latter were released later, bringing the total to 300. The commission found, and there is evidence to support the finding, that during 1940 and 1942, and until the freezing of new car production, appellant took no aggressive steps to increase its fleet, although the demand for taxicab service became increasingly great during this same period.

As we have indicated, appellant claims that any inadequacy of service, now or during the war years, is and was due to conditions beyond its control, that is— to rigid restrictions on civilian automobile production and operation during the war; to its inability to obtain additional equipment; and to greatly increased operating costs since the war. Appellant argues that *Shenandoah Suburban Bus Lines, Inc., Case,* 158 Pa. Superior Ct. 638, 46 A. 2d 26, 355 Pa. 521, 50 A. 2d 301, is applicable and controlling on this point. With this we do not agree. In the *Shenandoah* case the commission canceled the certificate issued to the carrier who operated a short bus route in Schuylkill County on the ground that the carrier had failed to furnish and maintain adequate, efficient, and reasonable service and facilities. We reversed because the commission's order was not supported by substantial evidence with rational probative force in that the service rendered by the carrier was not shown to be unreasonable and inadequate under the unusual circumstances of wartime conditions.

We are not unmindful of the fact that in the present case wartime conditions imposed a heavy burden upon appellant, and it may be conceded that for many deficiencies in its service to the public appellant is absolved by reason of these conditions. The commission in its order

of February 18, 1947, recognized that appellant could not be held responsible for inadequacies caused entirely by wartime conditions and restrictions over which it had no control. However, the commission went further, and found that the inadequacy of taxicab service furnished by appellant was in large part due to matters for which appellant was responsible, and which could not be ascribed to wartime conditions. For instance, the commission found that the inadequacy of appellant's service was due to its "failure to marshal and use available equipment to the fullest possible public advantage," and to the failure of appellant's management to expand its service and facilities in the face of unprecedented demand for additional service during the period preceding war restrictions. Finally, the commission found "that call and demand or taxicab service as presently available in the City of Pittsburgh is inadequate," this finding having been made February 18, 1947, a year and a half after hostilities ceased. We are of the opinion, as we have previously stated, that there is ample evidence to support the commission's finding of inadequacy of appellant's service, entirely apart from conditions which would excuse its failure. The commission's order in this respect being supported by substantial evidence, the present appeal is thus distinguishable from the *Shenandoah* case, supra.

The second phase of appellant's attack upon the validity of the commission's order is well presented and worthy of serious consideration. Appellant contends that the commission has arbitrarily and capriciously departed from its recognized policy of noncompetition of taxicab service in Pittsburgh, after having ordered appellant to make additions and improvements involving substantial expenditures and commitments in order to restore its service to an adequate status under normal conditions.

Appellant's argument is to the effect that the commission and the courts of this state have established a

policy of regulated monopoly, as opposed to regulated competition, in public utility matters. For support of this principle, it cites *Metropolitan Edison Co. v. Public Service Commission et al.,* 127 Pa. Superior Ct. 11, 191 A. 678, and *Hoffman et al. v. Public Service Commission,* 99 Pa. Superior Ct. 417. In the *Metropolitan* case we reversed an order of the commission granting a municipality the right to operate its own electric light plant in competition with an existing utility, and remitted the record for further action by the commission. We went on to say (127 Pa. Superior Ct. 11, 20, 191 A. 678, 682) that: ". . . the commission is authorized to determine, in the exercise of its administrative functions, when and to what extent an existing utility actually engaged in rendering a public service shall be protected from competition, either from a similar utility or through the rendition of the same service by a municipality." We also pointed out that in exercising its administrative discretion the commission could not act capriciously, arbitrarily, or unreasonably, and that an order of the commission must be founded on competent and relevant evidence and otherwise be in conformity with law. In the *Hoffman* case we sustained an order of the Public Service Commission refusing an application for a certificate of public convenience to operate taxicabs on call and demand in the city of Philadelphia; and we there said (99 Pa. Superior Ct. 417, 429): "The primary object of the public service laws is not to establish a monopoly or to guarantee the security of investment in public service corporations, but first and at all times to serve the interests of the public." Our rulings in those cases do not mean that the commission could not allow competition in taxicab service in the city of Pittsburgh in the present case. The propriety of permitting competition in the same field is peculiarly one within the discretion of the commission; this is true notwithstanding that the control of utilities as regulated monopolies, as opposed to destructive or unrestrained competition, has been a policy of this state recognized by legislative

enactments and judicial interpretation thereof. *Metropolitan Edison Co. v. Public Service Commission et al.,* supra, 127 Pa. Superior Ct. 11, 20, 191 A. 678; *Hoffman et al. v. Public Service Commission,* supra, 99 Pa. Superior Ct. 417, 429.

It is a general principle of utility law that competition will not be permitted among public utilities to such an extent as would defeat the purpose of the grant of the franchise and injure the public interest. At the same time, there is a certain latitude granted the administrative agency as to the extent of competition among franchised utilities which will best serve the public interest. In *John Benkart & Sons Co. v. Pennsylvania Public Utility Commission,* supra, 137 Pa. Superior Ct. 13, 16, 17, 7 A. 2d 588, 589, this Court stated the applicable principle as follows: "Whether the available transportation facilities in this area are, under the facts shown, sufficient and adequate to supply the demand is purely an administrative question. We have frequently stated that the extent to which there shall be competition in the intrastate transportation of freight and merchandise by common carrier is largely a matter of policy which the legislature committed to the Public Service Commission, and has now committed to the Public Utility Commission, and that the question is, for the most part, an administrative one which must be left to the sound judgment and discretion of the commission, and that its decision, if based on competent and relevant evidence, will not be disturbed by this court unless it is so capricious, arbitrary, or unreasonable as to amount to error of law or a violation of constitutional rights [citing cases]."

We are of the opinion, from a careful review of the evidence in this case, that the commission did not exceed its administrative discretion in granting the certificate to operate a competing taxicab service to Peoples Cab Company, Inc., in the city of Pittsburgh.

We do not think that the commission, by its order of August 21, 1946, directing appellant to take certain

steps to improve its service, was thereby obliged to refuse Peoples a certificate of public convenience to render a similar service. The commission's order of that date did not guarantee or in any way imply that appellant would be protected from competition. That order was directed toward effectuating a better and more adequate service for the public. In the exercise of its administrative functions the commission could decide whether to bring about this result (1) by regulated monopoly— continuing a policy of noncompetition in the taxicab service for Pittsburgh, or (2) by directing appellant to improve its service, and in addition thereto granting a certificate to a competing carrier. If the exercise of its discretion was based upon reasonable grounds, the administrative body could thus direct appellant to improve its service and at the same time permit a certain amount of competition. It may very well be that the inadequacy of service was so great and of such a nature that the improvement of appellant's service alone would not furnish a complete remedy. It was for the commission to determine what inadequacy could be or was remedied by the improvement of existing service, and what would be obviated by competition. One of the weapons in the commission's arsenal is the right to authorize competition where it is necessary in order to compel adequate service. *Davidson Transfer & Storage Co. v. United States,* D.C. Pa., 42 F. Supp. 215, 219; *Hall's Motor Transit Co. v. Pennsylvania Public Utility Commission et al.,* 150 Pa. Superior Ct. 60, 66, 27 A. 2d 428.

The commission, in the exercise of its administrative discretion in this respect, could not act arbitrarily; and it does not appear to have done so. Appellant was warned several times in that order not to rely on a continuation of a noncompetitive policy. Appellant claims that it has attempted in every way to comply with the commission's order of August 21, 1946, and has expended over a million dollars for the improvement of its service. Assuming this to be true, it does not follow,

for reasons which we have already stated, that appellant is necessarily guaranteed a continuance of its monopoly. The specific directives in the commission's order of August 21, 1946, which involved relatively large capital expenditures, were the following: (1) that appellant "augment their combined fleets of taxicabs by the purchase of new cabs" so as to render proper service; (2) that appellant equip at least five cabs with two-way radio equipment; and (3) that appellant "establish as soon as Federal and local government restrictions permit, at least two additional garages to be located in the North and South districts, respectively, of the City of Pittsburgh." We do not believe that these directives could be considered so stringent, or that they were made under such circumstances, that appellant was entitled to reasonably believe that it was thereby assured of no competition in the city of Pittsburgh. We can very properly assume that there may be cases where the permission of competition in the face of directives by the commission to improve the service of a certificated carrier would be arbitrary and unreasonable as a matter of law. But this is not such a case.

Appellant complains that the commission, in approving the application of Peoples, relied upon appellant's annual report for 1945 as showing a live mileage of 64.01 per cent with a revenue per mile of 14.78 cents, which report was not technically in the record. On the issue as to whether Peoples could operate at a profit, the commission found that Peoples' own exhibit No. 3, based on estimates of operating revenues and expenses of representative taxicab operations throughout the United States on a per mile ratio, showed an anticipated profit of $23,647.18. Peoples' estimate was based on a revenue of 12.61 cents per mile for 3,250,000 miles per year. Appellant's exhibit No. 18, introduced in answer to Peoples' exhibit No. 3 and based on appellant's experience in Pittsburgh, showed greater expenses of operation and a net loss to Peoples of $25,121.75. The commission said in its order: "If the mileage estimated

by the applicant [Peoples], which is not questioned by the protestant [appellant], is projected at the revenue per mile enjoyed by the latter [as shown by appellant's 1945 report which was not in evidence], the resultant revenue would be $480,350 instead of $410,000. On that basis even if the higher operating expense estimates of protestant [appellant] are accepted without question, the operation would result in a profit, before taxes, of $44,228.25."

The finding by the commission that Peoples had shown a reasonable expectation of operation at a profit is supported by evidence and binding upon us. The commission's order demonstrates that it did not rely entirely on the ratios shown by appellant's 1945 financial report. Moreover, the commission was not bound to believe any particular evidence on this issue. Peoples' own evidence supported the commission's finding, entirely apart from the 1945 report ratio figures of appellant. In so far as the commission may have relied on the 1945 report of appellant, it was not harmful or prejudicial to appellant. Virtually the same figures were in appellant's exhibits Nos. 2 and 5, offered in evidence in the previous investigation of appellant by the commission, and expressly incorporated by reference into the present proceeding. The commission did not consider evidence outside the record to the prejudice of appellant. Cf. *United States v. Pierce Auto Freight Lines, Inc.*, 327 U.S. 515, 66 S. Ct. 687, 90 L. Ed. 821.

On February 6, 1947, appellant presented a petition for rehearing to the commission, wherein appellant set forth that it expected delivery of 75 new cars a month, that it had installed two-way radio service in over fourteen cabs, that it had built one garage and was building another, that its operations during November and December, 1946, and January, 1947, were conducted at a loss, that it was having labor trouble, and that it expected its service to be adequate in about three months. The commission refused the petition for rehearing, or for further hearing. We think, under the circumstances,

the refusal was a matter within the discretion of the commission. It is well settled that the grant or the refusal of a petition for rehearing, or further hearing, is a matter within the discretion of the commission, and that the action of the commission will not be reversed unless an abuse of discretion is shown. See *Delaware & Hudson Co. v. Public Service Commission,* 96 Pa. Superior Ct. 169, 173, 174; *Harmony Electric Co. v. Public Service Commission,* 99 Pa. Superior Ct. 71, 79. See, also, section 203 of the Act of May 28, 1937, P. L. 1053, 66 PS 1123. The fact that a certificated carrier improves its service after another files an application to render competitive service in the manner demanded by the public is not particularly persuasive. Cf. *Hall's Motor Transit Co. v. Pennsylvania Public Utility Commission et al.,* supra, 150 Pa. Superior Ct. 60, 65, 66, 27 A. 2d 428. The petition for rehearing, or for further hearing, did not present, in our judgment, such a change in circumstances as would make refusal thereof an abuse of discretion. The principal matters set forth in the petition had been the subject of consideration at the previous hearings on the pending applications.

Finally, appellant asserts that the commission exceeded its authority in registering the securities certificate of Peoples under section 603 (a) of the Public Utility Law of May 28, 1937, P. L. 1053, Article VI, 66 PS 1243. The application of Peoples for registering a securities certificate set forth a proposal to issue 25,000 shares of common stock of no par value "with a fixed nominal value of One ($1.00) Dollar per share." The approximate cost of equipment and machinery was given in the application as $75,000, although, on cross-examination, one of the officers of Peoples testified it would be $106,000. David M. Sniderman, Secretary-Treasurer of Peoples Cab Company, Inc., testified that the stock was to be held by the four incorporators and distributed to employees only, not to the general public. Appellant asserts that his testimony was so inconsistent, unreliable, vacillating, and conflicting that the registra-

tion of the certificate was not supported by substantial evidence and was therefore arbitrary. The reason for this argument is because Mr. Sniderman, on cross-examination, stated in one place that Peoples proposed to sell their no par stock at $5 per share, and in another that it might be sold at $10 or $15 per share. The practice of issuing no par value stock in order to provide a flexible financial structure for a proposed corporation is well known, and appellant's position on this issue appears to have no merit.

Registration of a securities certificate by the Public Utility Commission can be made without a hearing. *Erie Lighting Co. et al. v. Pennsylvania Public Utility Commission*, 131 Pa. Superior Ct. 190, 195, 198 A. 901. See Act of May 28, 1937, P. L. 1053, Article VI, section 602, 66 PS 1242. In the present case all matters concerning the securities certificate and the proposed financial structure of the applicant (Peoples) were fully developed, and appellant had sufficient opportunity to cross-examine. Peoples presented a financial set-up which is prima facie self-sustaining, and gave a reasonable assurance that the venture would be profitable. The incorporators had $4,400 on deposit in bank; they subscribed $25,000 from the issue of stock; and they made arrangements to secure a loan of an additional $25,000. This made their initial working capital approximately $54,400.

We find no legal basis for setting aside the commission's registry of the securities certificate of Peoples. The registration by the commission of a securities certificate is no guarantee of financial soundness to the general investing public. These sections of the act (66 PS § 1241 et seq.) are merely related to the main purpose of the Public Utility Law of regulating public utility companies in the public interest. *York Railways Co. v. Pennsylvania Public Utility Commission*, 131 Pa. Superior Ct. 126, 131, 198 A. 920.

Order of the commission is affirmed, at the cost of appellant.