Motor Freight Express, Appellant, *v.* Pennsylvania Public Utility Commission (No. 1).

Argued September 30, 1955.  Before RHODES, P. J., HIRT, ROSS, GUNTHER, WRIGHT, WOODSIDE,. and ERVIN, JJ.

*James H. Booser,* with him *McNees, Wallace & Nurick,* for appellant.

*John R. Gavin,* Assistant Counsel, with him *Thomas M. Kerrigan,* Acting Counsel, for Public Utility Commission, appellee.

*Paul H. Rhoads,* with him *Jerome Solomon, F. Eugene Reader, Walter W. Shearer,* and *Rhoads, Sinon & Reader,* for applicant intervening appellee.

OPINION BY RHODES, P. J., January 17, 1956:

This is an appeal by Motor Freight Express from an order of the Pennsylvania Public Utility Commission of November 29, 1954, granting to Schreiber Transportation Company certain rights to transport property by motor vehicle. Samuel Schreiber and Marion Schreiber, copartners, trading as Schreiber Transportation Company, requested authority at Application Docket 51738, Folder 6, to transport property by motor vehicle, as a class A carrier, from the City of Pittsburgh and within a radius of fifty miles of the City-County Building in said city to points in the City of Philadelphia and within a radius of fifty miles of City Hall, in said city, and vice versa, excluding all intermediate points. Applicant was previously certificated as a class D carrier to transport foodstuffs for Lutz and Schramm from the City of Pittsburgh to various points in Pennsylvania; to transport structural glass for the United Plate Glass Company from the City of Pittsburgh and points within sixty miles of the city limits of the City of Pittsburgh to points in eastern Pennsylvania; to transport sugar from the City of Philadelphia to the City of Pittsburgh and points within fifty miles of the City-County Build-

ing; and to transport steel products for the Carnegie-Illinois Steel Corporation from its plants in the Counties of Allegheny and Westmoreland within fifty miles of the City-County Building in Pittsburgh to points in the City of Philadelphia.

The application was filed August 26, 1949, and Schreiber proposed to render direct overnight service between the areas covered in the application. Protests were filed by sixteen carriers. After numerous hearings, briefs were filed and oral argument was held before the commission. On August 13, 1951, the commission granted applicant authority to transport as a class D carrier property, excluding household goods and office furniture in use and property requiring the use of carryalls, winch trucks, winch tractors or pole trailers, from the City of Pittsburgh and points within an airline distance of thirty-five miles of the City-County Building in the City of Pittsburgh to points in the City of Philadelphia and points within thirty-five miles of City Hall in that city and vice versa, excluding intermediate points. By supplemental order of September 17, 1951, upon joint petition of certain affected carriers and applicant, the commission further excluded transportation of commodities in bulk in tank vehicles. The commission refused petitions for supersedeas and for rehearing and reconsideration, and on December 13, 1951, one of the protestants, Motor Freight Express, filed this appeal. Schreiber Transportation Company was allowed to intervene as an appellee. As the order of August 13, 1951, was in short form, the commission presented a petition to this Court for remission of the record in order to make more specific findings of fact; we granted the petition on January 23, 1952. The commission's order of November 29, 1954, from which this appeal has been taken, granted applicant the same rights as set forth in its order of August 13, 1951.

Prior to its approval of Schreiber's application in the present proceeding, the commission had granted certain rights to five motor carriers to transport property generally between the Philadelphia and Pittsburgh areas. A certificate was issued to Clark-Callahan, Inc. (now Highway Express Lines, Inc.) on September 30, 1940. Two other certificates were issued in 1940, to wit, Alko Express Lines (now held by Motor Freight Express) and Philadelphia-Pittsburgh Carriers, Inc. Under wartime conditions two additional certificates were granted in 1942, one to Kramer Brothers Freight Lines, Inc., and the other to Lancaster Transportation Company. From 1942 the commission did not see fit to grant any additional certificates for service between these areas although there have been numerous requests for such certificates. In addition to the five motor carriers, the Pennsylvania Railroad Company and the Baltimore and Ohio Railroad Company transport property generally between Pittsburgh and Philadelphia.

At the first hearing, counsel for appellant requested that this application be dismissed because the commission had granted similar rights to five motor carriers and had dismissed numerous other applications for such rights. It was appellant's contention the commission had adjudicated the question involved. The request was refused. Appellant now contends that the commission's action granting Schreiber's application, in view of the fact that numerous other similar requests had previously been denied, was arbitrary and capricious. We cannot agree that, merely because the commission had previously denied similar applications, its action here was necessarily arbitrary and capricious. In *Modern Transfer Co., Inc. v. Pennsylvania Public Utility Commission,* 139 Pa. Superior Ct. 197, 12 A. 2d 458, the commission granted the applicant authority, inter alia, to render motor service between

Allentown and Philadelphia. Prior to the order in that case, but while the application was pending, the commission had found in a number of other cases that service between Philadelphia and Allentown was adequate. Although we indicated that the action cast serious doubt on the validity of that part of the order involved, we said (page 207 of 139 Pa. Superior Ct., page 463 of 12 A. 2d) nevertheless ". . . this appeal must be disposed of on its own facts. The commission might be correct in this case and wrong in the others. We will therefore direct our attention to the facts shown in the record in this case." It should also be noted that in the present case the applications which the commission had previously refused were refused some time prior to the instant application. Moreover, no one can be oblivious to the increase in population and to the industrial growth in this Commonwealth. Even if it were claimed that the commission's action violated a policy of refusing additional competition between the areas involved, such contention could not be sustained. In *Aizen v. Pennsylvania Public Utility Commission*, 163 Pa. Superior Ct. 305, 316, 60 A. 2d 443, 449, we said: "A previously adopted policy may not furnish the sole basis for the commission's action in a particular case. Policy cannot be made a substitute for evidence in a proceeding before it. The conditions of a particular case may require the reversal of any administrative policy. . . The commission must remain free at all times in order to carry out the objectives of the utility law. In some instances . . . the facts may show that some competition rather than regulated monopoly is necessary for the service, accommodation, and convenience of the public."

In support of the application, Schreiber testified as to requests for service between the Philadelphia area and the Pittsburgh area. In addition, the manager of

applicant's Philadelphia terminal also testified to the many similar requests. Applicant also presented twenty-seven shipper witnesses. With the exception of certain shippers of steel products, these witnesses testified to the inadequacy of the present motor carrier and rail service and to the need for the proposed service. The dissatisfaction expressed by these witnesses ranged from delays in delivery and slow pickups to complete failure to pickup and to the absence of direct less-truckload movements. Many witnesses emphasized the need for direct daily overnight service which the applicant offered. The record also established that the applicant was a reliable and competent carrier.

A considerable portion of the testimony presented by protestants related to the adequacy of facilities available and to their ability to furnish additional equipment if needed. There was testimony that any certification of additional carriers would result in destructive competition and would directly affect the quality of service now being rendered by protestants. Much of the testimony presented by protestants was supplied by their solicitors who testified that they called upon shippers named by applicant as having requested its services into the area, or who had testified at the hearings in support of the application. In effect, protestants' testimony was that these shippers had not requested applicant's service between the areas involved, or that existing facilities were sufficient and that overnight service offered by protestants would be satisfactory. Representatives of four motor carriers testified that they were rendering overnight service between the Pittsburgh and Philadelphia areas. A representative of appellant, however, stated that on less than truckload shipments there was generally no overnight service, that delivery was on the second day unless specifically requested otherwise. Witnesses for the

two railroad protestants testified that on less than carload shipments delivery was on the second day. A witness for the Baltimore and Ohio Railroad Company, a protestant, further testified that service on carload shipments was next-day delivery. There was also other testimony that on truckload shipments there was overnight service by some of the protestants.

It is unnecessary to restate the principles of law applicable to review on appeal,[1] except to mention that, where the evidence presents, as here, a definite conflict as to the inadequacy of existing service and as to the public need of an applicant's proposed service in an area or areas, the sufficiency of the available facilities and the extent of competition to be allowed are administrative questions within the sound discretion and judgment of the commission. *Modern Transfer Company v. Pennsylvania Public Utility Commission*, 179 Pa. Superior Ct. 46, 55, 115 A. 2d 887. In view of the conflicting evidence in this proceeding, we are unable to say that the commission's order permitting applicant to compete with existing carriers between the two most important industrial and business areas in the Commonwealth is not supported by substantial evidence.

Appellant contends that the commission at least should have made a distinction in granting applicant's application between truckload service and less than truckload service. It is appellant's claim that the commission should have acted upon these services separately, and should have made findings as to the need

---

[1] See *Pittsburgh & Lake Erie Railroad Co. v. Pennsylvania Public Utility Commission*, 170 Pa. Superior Ct. 411, 415, 416, 85 A. 2d 646; *Zurcher v. Pennsylvania Public Utility Commission*, 173 Pa. Superior Ct. 343, 98 A. 2d 218; *Garner v. Pennsylvania Public Utility Commission*, 177 Pa. Superior Ct. 439, 450, 110 A. 2d 907.

and adequacy or inadequacy of each type of service. Thus, following appellant's contention, applicant could have been granted a certificate authorizing service on less than truckload shipments only, excluding truckload shipments. The commission was not obliged to act upon the two types of service separately. Even assuming there is no inadequacy as far as truckload shipments are concerned, the more lucrative truckload business need not be preserved to carriers who may be remiss in their service to the public on less than truckload shipments. Protestants assert that truckload business is a necessary and vital element in the maintenance of a balanced operation, and that, if applicant were given the right to transport property generally, including truckload shipments, protestants' operations might become unbalanced and thereby result in a curtailment of their services. If that is true, it follows that applicant could not maintain a balanced operation between the areas involved without truckload shipments. Consequently the denial of the right to applicant to transport truckload shipments in this case might result in no improvement in less than truckload service, which is obviously required. Although truckload shipments may be easier to handle and more profitable, nevertheless, in so far as the public is concerned, less than truckload shipments are important, possibly equally as important as truckload shipments. The public should not be denied the right to adequate less than truckload service merely because presently certificated carriers are desirous of the exclusive retention of the more profitable business. The granting of applicant's certificate with the right to transport truckload shipments may well induce the existing carriers to improve all phases of their service. It would seem reasonable that shippers should be entitled to utilize the truckload service of a carrier who also provides efficient

and adequate service on less than truckload shipments, rather than be forced to rely upon one carrier for less than truckload shipments and upon others for truckload shipments. However, there was testimony in the record in regard to inadequacy of service in so far as truckload service is concerned. One witness testified that his company operates twenty-four hours a day, and that truckload shipments are ready to be dispatched early in the morning, but that, even though requested the day before, a truck does not arrive until some time in the afternoon. Another witness testified that, on truckload shipments from Pittsburgh to Philadelphia, his company needed next-day delivery before noon, but that the service had been consistently poor.

An additional contention of appellant is that the commission, in considering less than truckload shipments, gave no weight to certain factors, including the reasonable requirements of the public generally, transit time, terminal services, pickup and delivery operations, cost of services, long distance operating conditions, and flow of traffic. Appellant's argument is that, if proper weight were given to these factors, the commission must necessarily conclude that "something less than 100% overnight service" is the standard on less than truckload shipments, and thus overnight less than truckload shipments are not required in all cases, or, because of the difficulty involved in such operations, 100 per cent overnight service is impossible. It is true that four of the protesting motor carriers presented testimony that their companies were rendering daily overnight service. Solicitors also offered overnight service to shippers who testified in favor of applicant or to those shippers applicant testified requested its services. Appellant's own witness testified that overnight service was rendered upon request. Therefore, we do not think the question involved is one of possibility or of a standard of 100

per cent overnight service. There may be instances when overnight service is not required, or there may be various shippers who do not need such service. However, the testimony in the record shows inadequacy of the existing services when such overnight service is required or needed even though such service is supposedly rendered daily or upon request.

Appellant also claims the commission improperly based the certificate authorizing transportation of property generally by Schreiber upon the desire of shippers of one commodity—steel—for a lower rate. If the only testimony to support Schreiber's application came from those representatives of the steel industry, primarily interested in rates, there might be some merit to appellant's contention. But that is not the situation. The commission's order itself recognizes that a few witnesses were interested primarily in rates and outside of that factor the existing service was satisfactory. But the commission's order states in part: "The application was supported by 27 shipper witnesses. Of the supporting witnesses, 23 testified that their concerns were not satisfied with the existing service. . . . Four other shipper witnesses testified that they desired additional service of a type and standard which applicant proposes rendering. . . . In addition, applicant submitted the names of 26 concerns which had requested applicant to render the proposed service." Appellant claims that five witnesses representing the steel industry were interested primarily in rates. At least one of these witnesses was dissatisfied with both rates and service. If the five witnesses were so concerned, we could not agree with appellant's contention. We certainly cannot assume that the commission failed to consider all other evidence in the case and based its order solely on the testimony of the representatives of the steel industry.

Appellant's final contention is that there is no substantial evidence that any inadequacy of service will be corrected by the issuance of the certificate of public convenience to applicant. Appellant questions applicant's ability to render a "superior service" to that rendered by existing certificated carriers because applicant would be subject to the same conditions as the presently certificated carriers. It would appear that it is appellant's claim that applicant cannot transport property between the two areas more rapidly than existing carriers. Assuming that to be correct, if the applicant actually renders direct overnight service, the service will tend to remedy existing inadequacy or improve available service since the testimony indicated that existing service is not an actual overnight service. In *Horn's Motor Express, Inc., v. Pennsylvania Public Utility Commission*, 148 Pa. Superior Ct. 485, 490, 26 A. 2d 346, 349, where there was a comparable situation, we said: "But they [appellants] insist that the existing service is an overnight service and that it is not only adequate, but there is no evidence to support a finding that the improvement in the service which Horlacher proposes is one that is demanded by convenience or necessity. That the existing service *purports* to be an overnight service, whether by Motor Freight Express or by rail, is pretty clear from the evidence. If it were *in fact* an overnight service and the only benefit to the public offered by Horlacher's proposed service were the saving of a few hours in total transportation time resulting from a somewhat later pickup and earlier delivery, we would, on this record, find it difficult to sustain the order. . . . But there was a substantial amount of testimony that ordinarily orders did not reach them [consignees] from the Philadelphia area until the second or even the third day. . . . But the point is, regardless of the explanation and regardless

of the fact that the existing service may be theoretically an overnight service, the testimony of witnesses, whose credibility was for the commission, indicated that it was not." The service proposed to be rendered here by applicant is not merely one saving a few hours in transportation, but an actual direct overnight service to compensate for the inadequacy disclosed by the record.

It is further claimed that granting the rights requested by applicant would not result in any improvement of service because applicant proposed to begin operations with only five pickup and delivery trucks in the Pittsburgh area and five in the Philadelphia area. Applicant had arranged to purchase additional equipment costing $200,000 upon the granting of the certificate of public convenience. It seems that appellant contends that applicant could not completely remedy any inadequacy of existing service in view of the limited amount of equipment to be used by applicant when operations were begun. That may be true but it is not the requirement. It is sufficient if the additional facilities would tend to correct or substantially improve the existing situation. *Garner v. Pennsylvania Public Utility Commission*, 177 Pa. Superior Ct. 439, 450, 110 A. 2d 907; *Kulp v. Pennsylvania Public Utility Commission*, 153 Pa. Superior Ct. 379, 33 A. 2d 724. For various reasons, the inadequacy of existing service may be such that it requires more than one additional carrier in the area. One additional carrier, if not completely correcting the situation, would at least tend to improve the existing condition. Cf. *Ruettger v. Pennsylvania Public Utility Commission*, 164 Pa. Superior Ct. 388, 64 A. 2d 675.

In addition to the service rendered by applicant, the granting of the certificate of public convenience may have a salutary effect in improving the service rendered

by others and in satisfying the public need. One of the weapons in the commission's arsenal is the right to authorize competition where it is necessary in order to compel adequate service. *Yellow Cab Company v. Pennsylvania Public Utility Commission,* 161 Pa. Superior Ct. 41, 52, 54 A. 2d 301. Additional certificated carriers may require existing carriers in an area to render adequate service of all types in order to meet competition. In both respects applicant's proposed service would be an accommodation or convenience to the public.

The order of the commission is affirmed, at the cost of appellant.