SUSQUEHANNA AREA REGIONAL
AIRPORT AUTHORITY,
Petitioner

v.

PENNSYLVANIA PUBLIC UTILITY
COMMISSION, Respondent.

Commonwealth Court of Pennsylvania.

Argued June 8, 2006.
Decided Nov. 21, 2006.

J. Bruce Walter, Harrisburg, for petitioner.

John Herzog, Asst. Counsel, Harrisburg, for respondent.

Joseph T. Sucec, Gardners, for intervenor, Capital City Cab Service.

BEFORE: COHN JUBELIRER, Judge and LEAVITT, Judge and FLAHERTY, Senior Judge.

OPINION BY Judge LEAVITT.

Susquehanna Area Regional Airport Authority (SARAA) petitions for review of an adjudication of the Public Utility Commission (PUC) sustaining a complaint filed by Capital City Cab Service, Inc. (Capital City). Capital City, a licensed common carrier, complained that SARAA's lease of its parking garage at Harrisburg International Airport to Capital City's competitor, Selgals, Inc., d/b/a American Taxi, gave American Taxi an unfair competitive advantage to provide outbound taxicab service from the airport. In this case we consider whether the PUC's power to license common carriers includes, by implication, the indirect power to regulate the marketplace conditions in which those common carriers compete.

## BACKGROUND

SARAA is a joint municipal authority established pursuant to the Municipal Authorities Act, 53 Pa.C.S. §§ 5601–5623, by the counties of Cumberland, Dauphin and York, the cities of Harrisburg and York, and the townships of Lower Swatara and Fairview. SARAA owns and operates the Harrisburg International Ariport (Airport), as well as the roads, parking areas and other facilities located on the property. Capital City and American Taxi are common carriers that operate taxicabs pursuant to a certificate of public convenience issued by the PUC to conduct business in a geographical area that includes the location of the Airport.[1]

---

1. The Public Utility Code defines "common carrier" and "common carrier by motor vehicle" as follows:

"Common carrier." Any and all persons or corporations holding out, offering, or undertaking, directly or indirectly, service for

For many years taxicab companies have provided outbound taxi service from the Airport by forming a queue at the curb adjacent to the main Airport terminal. For this opportunity these taxicab companies were required to contract with SARAA. The contract required the taxicab company to obtain insurance coverage up to $1 million for each bodily injury or property claim and $2 million in the aggregate for each accident. Capital City has provided outbound service at the Airport in accordance with a SARAA contract since 1998. However, in January 2004, Capital City reduced its coverage to match the much lower insurance levels required by the PUC as a condition of maintaining its certificate of public convenience.[2] SARAA terminated Capital City's contract in April 2004 when it learned of the contract breach.

In early 2004, in anticipation of opening a new terminal at the Airport, SARAA solicited bids from the four taxi companies licensed in Dauphin County to provide outbound taxi service from the Airport under an exclusive arrangement. Capital City submitted a bid, but its bid was rejected. On August 2, 2004, SARAA awarded American Taxi its Single Taxi Cab License Agreement (Exclusive Agreement), in which it granted American Taxi the following rights:

(1) The full and sole authority, rights, and privileges for the operation of a taxicab service from [the Airport], situated in Middletown, Pennsylvania for the pick up of passengers at the terminal building, in the multi-modal transportation facility.

(2) The use of designated parking spaces located within the so-called multi-modal transportation facility....

(3) The use of an office space designated in Exhibit 2.

(4) The use of up to twenty (20) parking spaces for off-duty taxicabs in the bullpen assigned by SARAA....

Exclusive Agreement, Article I, Reproduced Record at 704 (R.R.___). In exchange, American Taxi agreed to provide outbound service customers with new vehicles, to be on-call 24 hours a day and to meet other standards demanded by SARAA.[3] American Taxi also agreed to pay SARAA 4% of its gross revenue, with the

compensation to the public for the transportation of passengers or property, or both, or any class of passengers or property, between points within this Commonwealth by, through, over, above, or under land, water, or air....
"Common carrier by motor vehicle." Any common carrier who or which holds out or undertakes the transportation of passengers or property, or both, or any class of passengers or property, between points within this Commonwealth by motor vehicle for compensation....
66 Pa.C.S. § 102. Taxicabs fall into these classifications.

2. PUC regulations set forth minimum insurance requirements for common carriers based upon the number of passengers per vehicle. Common carriers that transport fewer than 16 passengers per vehicle must maintain a minimum of $35,000 in insurance coverage on each vehicle to cover liability for bodily injury, death or property damage incurred in an accident arising from authorized service. 52 Pa.Code § 32.11(b). In addition, coverage must include first party medical benefits in the amount of $25,000 and first party wage loss benefits in the amount of $10,000 for passengers and pedestrians. *Id.*

3. Other standards demanded by SARAA included: having present at the Airport a minimum number of cabs at peak travel times; providing clean, uniformly marked cabs that are no more than five years old and in good mechanical and physical condition; employing uniformly attired, well-groomed and courteous cab drivers who speak English; and maintaining insurance at levels specified by SARAA. Exclusive Agreement, Article IV, R.R.706–707.

percentage increasing as gross revenue increased.

Also at this time, SARAA implemented new traffic regulations for the new terminal and the adjacent parking garage, *i.e.*, the "multimodal transportation facility." The regulations prohibit all taxicabs or limousines, including American Taxi, from forming a queue at the curb to pick up customers. Instead, SARAA has designated the parking garage for the pick up of all outbound taxicab or limousine customers. The queue for receiving outbound service is now located on the second floor of the parking garage, at a location near the second floor of the terminal, to which outbound service customers must walk. Taxicabs and limousines providing outbound passenger service pay a $10 surcharge and parking fee for the privilege of using the parking garage to form a queue. Because of its Exclusive Agreement, American Taxi meets its outbound service customers on the first floor of the parking garage, and it pays SARAA a percentage of its gross revenue, as opposed to a $10 surcharge or parking fee. American Taxi provides most of the outbound service at the Airport.

On May 18, 2004, Capital City initiated the present action by filing a complaint with the PUC.[4] Capital City asserted that

(1) SARAA exceeded its authority by demanding that it obtain $1.5 million in insurance coverage because only the Commission has authority to impose insurance requirements on common carriers; and (2) SARAA wrongfully terminated Capital City's contract for outbound taxi service on April 1, 2004. The complaint was referred to an ALJ, who identified the central issues to be: (1) whether the PUC's authority to grant certificates of public convenience vests it with exclusive authority to determine how outbound service from the Airport is to be provided by common carriers; (2) whether the PUC has the authority to prevent SARAA from imposing requirements upon a certificated taxicab company that the PUC, itself, does not impose; and (3) whether the PUC has the authority to prevent SARAA from giving preferential leasehold terms to a single taxicab company among the four licensed to provide service in the Airport region.

At the hearing, the parties presented a stipulation of facts. In addition, Capital City presented documentary evidence and the testimony of three witnesses: Ayale Salame, owner of Capital City; Shirley Mohn, Assistant Manager and Dispatcher for Capital City; and Alfred Testa, Director of Aviation for SARAA, as on cross-examination.[5] SARAA presented the tes-

---

4. Capital City's complaint with the PUC was not the first action it took against SARAA. Capital City first petitioned the PUC for emergency relief on April 26, 2004. After the PUC declined the request, Capital City filed a complaint for declaratory and equitable relief in the Dauphin County Court of Common Pleas. The trial court granted preliminary injunctive relief and ordered SARAA to allow Capital City to pick up prearranged and pre-contracted outbound fares at the Airport, as well as any outbound fares that "coincidentally and simultaneously" appeared at curbside as an inbound fare left a Capital City taxi. Common pleas transferred all other substantive issues raised by Capital City to the PUC. On appeal, this Court, in an unpublished opinion, affirmed that part of the trial court's order

transferring the case to the PUC because Capital City's substantive issues fell squarely within the agency's jurisdiction. *Capital City Cab Service, Inc. v. Susquehanna Area Regional Airport Authority* (No. 1492 C.D.2004, filed June 2, 2005). This Court vacated the trial court's preliminary injunction because the trial court was determined to lack subject matter jurisdiction.

5. Capital City's documents included: certificates of insurance; the April 1, 2004, letter to Capital City suspending its privilege to provide ground transportation out of the Airport for failure to provide a current certificate of insurance; the May 26, 2004, letter from Mr. Testa informing Capital City that it was not

timony of Alfred Testa and a copy of the resolution establishing the Exclusive Agreement and the fees charged for garage use by taxicab companies that do not have a contract with SARAA.

The ALJ issued an initial decision recommending that the PUC sustain Capital City's complaint, and SARAA filed exceptions. Thereafter, the PUC issued an adjudication adopting the ALJ's initial decision and denying SARAA's exceptions. The PUC acknowledged it did not have any authority to supervise SARAA. However, because it does have authority over the service area of a common carrier, the PUC concluded that "SARAA must be *directed* to allow other legitimately certificated carriers reasonable access to such [outbound] fares." Adjudication at 8 (emphasis added). Although the PUC did not order any specific remediation, its order stated, in relevant part, as follows:

> 3. That the complaint filed by Capital City Cab Service, Inc. ... is sustained.
> 4. That Capital City Cab Service, Inc., as a Commission certificated common carrier by motor vehicle authorized to render call or demand service throughout Dauphin County, remains authorized to render such service on a hail basis at Harrisburg International Airport.

Adjudication at 10.

Nevertheless, the PUC's adjudication promises future actions. The PUC believes that the Exclusive Agreement between SARAA and American Taxi, together with SARAA's traffic regulations, have unduly restricted Capital City's ability to

provide outbound service at the Airport. In the PUC's view, SARAA has forced Capital City to abandon a portion of its service territory, thereby infringing upon the PUC's exclusive authority to license common carriers. The PUC also believes that it has authority to prohibit American Taxi from further participation in the Exclusive Agreement. Indeed, the ALJ suggested this would be the appropriate remedial action to redress the harm caused to Capital City.

 On appeal, SARAA presents four issues for our review.[6]

First, SARAA contends that the PUC erred in finding that SARAA has precluded Capital City from providing outbound service from the Airport, and, in any case, there is no such thing as a "partial forced abandonment" that is recognized in the industry, let alone addressed in the Public Utility Code.

Second, SARAA asserts that the PUC erred in determining SARAA was not entitled to enter into an exclusive lease of its own Airport property to a taxi company willing to meet its high service standards and willing to pay a rent calculated on a percentage of the taxicab company's revenue.

Third, SARAA contends that the PUC erred in determining the PUC could force American Taxi to abandon its contract with SARAA.

Fourth, SARAA contends that the PUC erred in holding that SARAA may not require additional insurance of a taxicab

selected for the exclusive contract; and a copy of the Exclusive Agreement.

6. This Court's scope of review is limited to determining whether the PUC committed an error of law, whether its findings are supported by substantial evidence, or whether constitutional rights have been violated. *Yellow Cab Company of Pittsburgh v. Pennsylva-*

*nia Public Utility Commission,* 673 A.2d 1015, 1017 n. 2 (Pa.Cmwlth.1996). The PUC's expert interpretation of an aspect of utility law is entitled to great deference and will not be reversed on appeal unless clearly erroneous. *Popowsky v. Pennsylvania Public Utility,* 550 Pa. 449, 462, 706 A.2d 1197, 1203 (1997).

company as a condition of using Airport property.

SARAA's first three issues are so closely related that they can be reduced to one: whether the contractual arrangement between SARAA and American Taxi is unlawful and can be nullified by the PUC. The question of SARAA's ability to require higher limits of coverage from common carriers picking up customers at the Airport will be treated as the second issue.

## THE EXCLUSIVE AGREEMENT

The central issue in this appeal is whether SARAA acted within its authority and, if so, whether the PUC can do anything about SARAA's actions if the PUC believes that they are not fair to the other common carriers licensed to provide taxi service at the Airport. SARAA maintains that it has not, as a factual matter, forced

Capital City to abandon service at the Airport. In any case, SARAA asserts that it has been authorized by the Municipal Authorities Act,[7] to take all of the actions about which Capital City complains. The PUC counters that SARAA has infringed upon the PUC's statutory authority to regulate common carrier service. Specifically, the PUC contends that SARAA has effectively forced Capital City, "to abandon a portion of its [PUC] granted service territory" and did so without permission from the PUC. Adjudication at 7–8.

■ The PUC and SARAA are each creatures of statutes. As such, they may exercise only those powers conferred by statute.[8] We begin with a review of the statutory scheme governing SARAA.

An airport authority, such as SARAA, is charged with "constructing, financing, improving, maintaining and operating ...

7. Section 5607(d) of the Municipal Authorities Act provides in relevant part:

Powers.-Every authority may exercise all powers necessary or convenient for the carrying out of the purposes set forth in this section, including, but without limiting the generality of the foregoing, the following rights and powers:

\* \* \* \* \* \*

(9) To fix, alter, *charge and collect rates and other charges* in the area served by its facilities at reasonable and uniform rates to be determined exclusively by it *for the purpose of providing for the payment of the expenses of the authority*, the construction, improvement, repair, maintenance *and operation of its facilities* and properties ... and *to determine by itself exclusively the services and improvements required to provide adequate, safe and reasonable service, including extensions thereof, in the areas served.*

\* \* \* \* \* \*

(13) To *make contracts* of every name and nature and to execute all instruments *necessary or convenient for the carrying on of its business.*

(14) Without limitation of the foregoing, to borrow money and accept grants from and to *enter into* contracts, *leases* or other

transactions *with any* Federal agency, the Commonwealth or a municipality, school district, *corporation* or authority.

\* \* \* \* \* \*

(28) To adopt rules and regulations to provide for the safety of persons using facilities of an airport authority pertaining to *vehicular traffic control.*

53 Pa.C.S. § 5607(d)(9),(13), (14), and (28) (emphasis added).

8. An authority formed under the Municipal Authorities Act has no inherent powers and may do only those things that the legislature has expressly or by necessary implication placed within its power to do. *Naylor v. Township of Hellam*, 565 Pa. 397, 403, 773 A.2d 770, 773–774 (2001). Likewise, an administrative agency, such as the PUC, "cannot, by mere usage, invest itself with authority or powers not fairly or properly within the legislative grant; *it is the law which is to govern rather than departmental opinions in regard to it." Commonwealth v. American Ice Company*, 406 Pa. 322, 332, 178 A.2d 768, 773 (1962) (quoting *Federal Deposit Insurance Corp. v. Board of Finance & Revenue of Commonwealth*, 368 Pa. 463, 472, 84 A.2d 495, 499 (1951)) (emphasis in original).

airports *and all facilities necessary or incident thereto.*" 53 Pa.C.S. § 5607(a)(3) (emphasis added). SARAA has the right and the power "to determine *by itself exclusively* the services and improvements required to provide adequate, safe and reasonable service ... in the areas served." 53 Pa.C.S. § 5607(d)(9) (emphasis added). Further, an authority "may exercise all powers necessary or convenient ... [including the power] *to ... lease ... any property* ... acquired by it." 53 Pa.C.S. § 5607(d)(4) (emphasis added). As explained by this Court, these statutory provisions grant broad discretion to a municipal authority, such as SARAA, in deciding how it will operate its business. *Helmerich Drive–it–Yourself, Inc. v. Erie Municipal Airport,* 149 Pa.Cmwlth. 1, 612 A.2d 562, 565 (1989).[9]

We agree with SARAA that its actions fall squarely within its powers granted under the Municipal Authorities Act. Indeed, SARAA's determination that taxis may no longer form a queue at the curb was required by the new security mandates by the Federal Aviation and Transportation Security Act, 49 U.S.C. §§ 40101–40129. Because SARAA decided that outbound taxi service should be a more convenient and pleasant experience for passengers arriving at the Airport, it chose to contract on an exclusive basis with a taxicab company willing and able to meet SARAA's standards. SARAA has been expressly authorized to enter into "contracts of every name and nature" that it finds "convenient for the carrying on of its business" and to charge fees to pay the "expenses ... [for]

the construction, improvement, repair, maintenance and operation of its facilities," including a parking garage. 53 Pa.C.S. § 5607(d)(9), (13).

Nevertheless, we agree with the PUC that SARAA must exercise these rights lawfully. It may not, for example, contract with an *unlicensed* taxicab company even though that company might be able to meet all of SARAA's performance standards of prompt pickups in new vehicles operated by pleasant drivers wearing crisp uniforms. Unlicensed taxicabs violate the Public Utility Code, and the PUC would be within its rights to seek an injunction against the participation of an unlicensed taxicab company in such an arrangement. *Pennsylvania Public Utility Commission v. Israel,* 356 Pa. 400, 52 A.2d 317 (1947). The real question, then, is whether SARAA's regulations or the Exclusive Agreement violate any provision of the Public Utility Code.

■ There are two principal provisions in the Public Utility Code on which the PUC bases its argument that it may intervene to prevent SARAA from leasing its parking garage to American Taxi in the way that it did. First, the PUC believes that the ability to license common carriers for a specific geographical area implicitly authorizes it to regulate competition in that area. Second, the PUC believes that its authority to regulate any public utility's voluntary abandonment of its service includes the ability to regulate an "involuntary partial abandonment." We review each theory *seriatim.*

9. In *Helmerich,* a car rental company challenged an airport authority's fees since the car rental company operated off site of the airport. This Court concluded that "the Municipal Authorities Act clearly provides municipal authorities with wide discretion in determining how to conduct their business and that the permit fee in question is a power

conveyed to [the airport authority] under the Municipal Authorities Act." *Helmerich,* 612 A.2d at 565. We held that the airport authority "is merely attempting to recoup the expenses it incurs in operation of the airport and the permit fee is a cost which [the car rental company] must expend in order to do business." *Id.*

■ Unquestionably, the PUC has exclusive authority to license taxicab companies. A certificate of public convenience will be granted where it is "necessary or proper for the service, accommodation, convenience, or safety of the public." 66 Pa.C.S. § 1103(a).[10] There are limits to the concept of necessity. "Absolute necessity for the additional service is not a requisite, and it is not necessary that applicant establish a present demand for the service in *every square mile of the territory certificated;* proof of necessity within the area generally is sufficient." *Leaman Transportation Co. v. Pennsylvania Public Utility Commission*, 175 Pa.Super. 553, 106 A.2d 901, 904 (1954) (emphasis added). A certificate does not guarantee the security of the common carrier's investment, and it does not grant the common carrier a monopoly. *Yellow Cab Company of Pittsburgh v. Pennsylvania Public Utility Commission*, 161 Pa.Super. 41, 54 A.2d 301, 306 (1947).

It is also true that the certificate of public convenience provides a common carrier, or any public utility, with entry to a discrete territory or marketplace. 66 Pa. C.S. § 1101 (stating that the certificate of public convenience shall include a "description of the nature of the service and of the territory in which it may be offered, rendered, furnished or supplied."). The service and territory may not be enlarged except on approval of the PUC. *Makovsky Bros., Inc. v. Pennsylvania Public Utility Commission*, 55 Pa.Cmwlth. 435, 423 A.2d 1089, 1092 (1980). However, the obverse is not the case: a reduction in a common carrier's service does not require PUC approval unless it is the design of the common carrier.[11] Indeed, it is understood that a common carrier's ability to provide service successfully is largely a function of the marketplace. *Yellow Cab Company of Pittsburgh v. Pennsylvania Public Utility Commission*, 60 Pa.Cmwlth. 343, 431 A.2d 1106, 1107–1108 (1981) (holding that nonuse of a certificate of public convenience does not constitute an abandonment, particularly when compelled by events and circumstances beyond the carrier's control rather than by the carrier's initiative).

■ The PUC's position that every taxicab company must have equal access to the Airport parking garage because each holds a certificate of public convenience for a specific territory lacks a foundation in law.[12] First, precedent teaches that the

10. It states, in relevant part, as follows:

Every application for a certificate of public convenience shall be made to the commission in writing, be verified by oath or affirmation, and be in such form, and contain such information, as the commission may require by its regulations. A certificate of public convenience shall be granted by order of the commission, only if the commission shall find or determine that the granting of such certificate is necessary or proper for the service, accommodation, convenience, or safety of the public. 66 Pa.C.S. § 1103(a). The PUC has announced in a statement of policy relating to motor common carrier applications for a certificate that it will not allow "entry of a new carrier into the field [that] would endanger or impair the operations of existing common

carriers to an extent that, on balance, the granting of authority would be contrary to the public interest." 52 Pa.Code § 41.14(c).

11. The concept of abandonment of a public utility's service is discussed more fully later in this opinion.

12. The Commission stated in its Adjudication that its authority over a utility's service area is exclusive. In support, it cited *Borough of Grove City v. Pennsylvania Public Utility Commission*, 95 Pa.Cmwlth. 188, 505 A.2d 346 (1986) and *Wattsburg Telephone Cooperative Association v. Pennsylvania Public Utility Commission*, 182 Pa.Super. 594, 128 A.2d 160 (1956).

First, no one challenges the point that the PUC alone has authority to determine the

certificate gives only entrance to, not success in, a given territory. *Yellow Cab Co.,* 54 A.2d at 305. Second, it has long been understood a common carrier's certificate of public convenience does not trump the rights of other persons with an interest in how the common carrier operates. In *City of Easton v. Miller,* 265 Pa. 25, 108 A. 262 (1919), for example, the Supreme Court held that the Public Service Law, the predecessor to the Public Utility Code, did not deprive the City of Easton of the power to regulate the use of its streets by licensed common carriers. Accordingly, the Supreme Court affirmed the conviction of a motorman who believed, mistakenly, that a licensed street car company authorized to operate on the streets of Easton could do so without regard to Easton's traffic ordinance.

The PUC does not like the Exclusive Agreement designed by SARAA.[13] However, there is nothing new about the arrangement between SARAA and American Taxi. Likewise, there is nothing new about the consternation caused by such an arrangement. In *Donovan v. Pennsylvania Company,* 199 U.S. 279, 26 S.Ct. 91, 50 L.Ed. 192 (1905), the United States Supreme Court held that the owner of a train station could enter into an exclusive lease of a carriage stand and small piece of ground at the station with a single cab company, namely the one that agreed to "keep at all times clean vehicles, carriages, and cabs with uniformed, honest, and competent drivers, who would be satisfactory to the [railway] company." *Id.* at 282, 26 S.Ct. 91. The Supreme Court rejected the contention of rival cab companies that its cabs and hackmen were entitled to do business at a place devoted to public uses, such as a train station. The facts in *Donovan* are virtually identical to those in the case under consideration, differing only in the mode of transportation.

The legal issues are also similar. The railway corporation in *Donovan* was licensed, and its property, including the station house and depot, was devoted to public use. Nevertheless, the fact that the train station was used by the public did not alter the fact that the property of the railway company was private property.[14] The Supreme Court explained,

boundaries of a utility's service area. It is beside the point. It might have been relevant if, for example, SARAA had entered into the Exclusive Agreement with a common carrier licensed only to operate in Lebanon County. It did not. American Taxi is licensed to operate in Dauphin County, where the Airport is located.

Second, *Grove City* and *Wattsburg* are inapposite. They concern a power company and a telephone company, not a common carrier. Each utility operated under a certificate of authority that gave the utility an *exclusive* territory. Each complained when a neighboring utility allegedly invaded that exclusive territory without permission from the PUC. Here, we deal with common carriers that are all authorized to operate in Dauphin County. Competition is expected between them, and this competition is not regulated by the PUC.

**13.** When acting in its proprietary, rather than its governmental capacity, a municipal authority operates like a private business. *In re Acquisition of Water System in White Oak Borough,* 372 Pa. 424, 427–28, 93 A.2d 437, 439 (1953). SARAA, like any private business, leases its parking facility under a variety of arrangements, including the one with American Taxi.

**14.** *See also Western Union Telegraph Company v. Pennsylvania Railroad Company,* 195 U.S. 540, 25 S.Ct. 133, 49 L.Ed. 312 (1904) (the powers of property ownership permit the railroad to grant exclusive rights to a single telegraph company to erect telegraph lines in the railroad right of way regardless of the statutory provision that telegraph companies may use the public right of ways without charge); *Philadelphia & Reading Railroad Company v. Hummell,* 44 Pa. 375 (1863) (a railroad has the right to exclusive possession as a purchaser of land taken by eminent domain).

Although its functions are public in their nature, the company holds the legal title to the property which it has undertaken to employ in the discharge of those [public] functions. And, as incident to ownership, it may use the property for the purposes of making a profit for itself.... It is not bound to so use its property that others, having no business with it, may make profit to themselves. Its property is to be deemed, in every legal sense, private property as between it and those of the general public who have occasion to use it for purposes of transportation.

*Id.* at 294, 26 S.Ct. 91. Pennsylvania case law is consistent. Our courts have issued injunctions to enforce exclusive arrangements between railroad stations and taxicab companies in spite of similar challenges to the legality of such arrangements.[15]

The *Donovan* principles have application here. SARAA's rights as a property owner have not been diminished because it is providing a public service. SARAA has the express right to control entry to and use of Airport property, and it can exercise this control by entering into different arrangements for the use of its parking garage as SARAA deems appropriate for the Airport. The PUC's theory that Capital City's certificate of public convenience trumps SARAA's right to manage the Airport is no more compelling than the motor-

man's argument in *City of Easton* that his employer's authority to operate in Easton under a certificate of public convenience trumped Easton's authority to regulate its streets.

For the PUC to restrict SARAA's rights to manage its Airport property, its power to do so would have to be stated in clear terms in the Public Utility Code. However, no such power has been conferred upon the PUC in the Public Utility Code. The PUC "cannot ... invest itself with authority or powers not ... within the legislative grant." *American Ice Company,* 406 Pa. at 332, 178 A.2d at 773. To accept the PUC's theory that the power to issue a certificate of public convenience includes the power to deprive SARAA of its right to manage its Airport would be to sanction a power not "within the legislative grant." *Id.* This we will not do.

We consider next whether the Public Utility Code prohibits a "partial forced abandonment" of a common carrier's service area, as maintained by the PUC. For its part, SARAA argues that the PUC's "partial forced abandonment" doctrine is made up out of whole cloth, not the Public Utility Code. SARAA also argues that the facts do not support the PUC's application of this "newly invented" doctrine to this case. It observes that Capital City can provide inbound service without restriction, and, further, Capital City can provide

---

**15.** In *Pennsylvania R.R. Co. v. Harrisburg Taxicab & Baggage Co.,* 3 Pa. D. & C. 470 (1923), relying upon *Donovan,* the court held that the Pennsylvania Railroad, as owner and operator of the Harrisburg Railroad Station, was entitled to an injunction to prevent taxicabs from using the station facilities. As here, a contract gave a single taxicab company the exclusive right to park cars and solicit fares at the station; rival taxicab companies continued to enter the station property to solicit business.

In *Lehigh Valley Railroad Company v. Graham,* 64 Pa.Super. 437 (1916), the Superior Court cited *Donovan* and *Appeal of Cumberland Valley Railroad Co.,* 62 Pa. 218 (1869), and granted an injunction to the railroad company to exclude from its depot grounds and passenger station all hackmen or expressmen entering the property to solicit baggage or passenger business. The railroad company had a contractual arrangement with a single transfer company to furnish all vehicles necessary for the accommodation of passengers arriving at the stations on its trains.

outbound service from the Airport even though it may no longer meet passengers at the curbside. We agree that the Public Utility Code does not regulate involuntary abandonment, partial or otherwise.

■ Abandonment of a property or right requires a voluntary or intentional action. *Emerald Coal & Coke Co. v. Equitable Gas Co.*, 378 Pa. 591, 597, 107 A.2d 734, 737 (1954). As noted, curtailment or even nonuse of a certificate of public convenience does not constitute abandonment. *Yellow Cab Company of Pittsburgh*, 431 A.2d at 1107–08. The voluntary surrender or abandonment of a service by a public utility requires PUC approval. 66 Pa.C.S. § 1102(a)(2).[16] However, the *involuntary* loss of market share is not an abandonment; and such an event does not trigger an application requirement by any party, common carrier or customer. Market share is neither guaranteed nor regulated by the PUC. Stated otherwise, a common carrier's loss of market share, for any reason, is not an event that can be shoehorned into the PUC's regulation of voluntary abandonment. The PUC's argument that it may regulate and prevent a "partial forced abandonment" of a service area simply lacks support in the Public Utility Code.

The PUC does regulate certain public utility contracts. Section 508 of the Public Utility Code provides, in relevant part, as follows:

The commission shall have power and authority to vary, reform, or revise, upon a fair, reasonable, and equitable basis, any obligations, terms, or conditions of any *contract* heretofore or hereafter *entered into between any public utility and any person, corporation, or municipal corporation*, which embrace or concern a public right, benefit, privilege, duty, or franchise, or the grant thereof, or are otherwise affected or concerned with the public interest and the general well-being of this Commonwealth.

66 Pa.C.S. § 508 (emphasis added). American Taxi is a public utility. However, the PUC held in its adjudication that Section 508 did not apply to the Exclusive Agreement because SARAA, the other party to the contract, is not a "person, corporation or municipal corporation" as those terms are defined in the Public Utility Code.[17] Therefore, the Exclusive Agreement is not a species of contract that the PUC can reform or revise under Section 508. All parties agree with the PUC's analysis, and so does this Court.

In spite of its conclusion that Section 508 did not apply to the Exclusive Agreement, the PUC went on to hold, nevertheless, that it could nullify that contract. It reasoned that it could order American Taxi not to participate in the Exclusive Agreement because a certificated common carrier, such as American Taxi, is required to comply with orders of the PUC. 66 Pa.C.S. § 501(c). Accordingly, the PUC may or-

---

**16.** It states, in relevant part, as follows:

Upon the application of any public utility and the approval of such application by the commission, evidenced by its certificate of public convenience first had and obtained, and upon compliance with existing laws, it shall be lawful:

\* \* \* \* \* \*

(2) For any public utility to abandon or surrender, in whole or in part, any service.

66 Pa.C.S. § 1102(a)(2).

**17.** The PUC noted that SARAA is not a "person" because it is not an "individual, partnership or association," as "person" is defined in 66 Pa.C.S. § 102. It is not a stock "corporation" as defined in 66 Pa.C.S. § 102. SARAA is an authority, which is a type of "municipal corporation," but it does not provide a public utility service; accordingly, SARAA is not a "municipal corporation" as defined in 66 Pa. C.S. § 102.

der American Taxi, pursuant to 66 Pa.C.S. § 501(c), to abandon its contract with SARAA. There are several flaws to the PUC's line of reasoning.

First, as noted above, the PUC does not have the express power to approve or disapprove the contract between American Taxi and SARAA. It is a leap, breathtaking in scope, for the PUC to contend that it has the implicit power, however, to reach the same result. If this were true, there was no reason for Section 508 to have been included in the Public Utility Code. The PUC's position also does violence to the principle *expressio unius est exclusio alterius*. *Atcovitz v. Gulph Mills Tennis Club, Inc.*, 571 Pa. 580, 589, 812 A.2d 1218, 1223 (2002) (holding that the inclusion of a specific matter in a statute implies the exclusion of other matters). Because the Exclusive Agreement was excluded from regulation under Section 508, the only provision authorizing review of a public utility's contract, it has been excluded from any review by the PUC.

Second, the PUC's authority to issue orders under Section 501(c) of the Public Utility Code is limited. We have explained that this power must be read in light of the enumerated powers set forth in the Public Utility Code. *United Telephone Company of Pennsylvania v. Pennsylvania Public Utility Commission*, 676 A.2d 1244 (Pa.Cmwlth.1996). It also has long been understood that the PUC's statutory authority to act in a given case must be clear. *West Penn Railways Co. v. Public Utility Commission*, 135 Pa.Super. 89, 4 A.2d 545 (1939). Stated otherwise, the PUC's power to issue an order under Section 501(c) is limited to subjects covered in the Public Utility Code. *Springdale Township v. Allegheny County Board of Property Assessment, Appeals and Review*, 78 Pa.Cmwlth. 100, 467 A.2d 74 (1983).

A subject not covered in the Public Utility Code is the regulation of competition among common carriers. The PUC may not prohibit a common carrier from doing lawful acts that the PUC happens to believe are harmful in some way, unless directly addressed in the Public Utility Code. An administrative agency may only exercise those powers that have been expressly conferred upon it. *Aetna Casualty and Surety Company v. Insurance Department*, 536 Pa. 105, 118, 638 A.2d 194, 200 (1994) (holding that the Insurance Department lacked express authority to order an insurer to cease practices not prohibited by law but that the department found harmful to policyholders). *Aetna* teaches that administrative agencies do not enjoy a general right to order that which they may believe will be appropriate in the industry they regulate.

The Public Utility Code did not grant the PUC the authority to nullify contracts between common carriers and airport authorities. The PUC's assertion that it is not prohibited from exercising such authority flies in the face of the principle that an administrative agency may only exercise those powers that have been clearly and expressly conferred upon it. *Aetna*, 536 Pa. at 118, 638 A.2d at 200. Because American Taxi has not violated any substantive provision of the Public Utility Code, the PUC cannot order American Taxi to abandon its contractual privileges and duties under the Exclusive Agreement in which it has made a substantial investment. Likewise, the PUC may not "direct" SARAA to terminate or revise the Exclusive Agreement. In short, the PUC's position that it has "indirect authority" over the Exclusive Agreement lacks the necessary foundation in the Public Utility Code.

## SARAA INSURANCE REQUIREMENTS

On the issue of whether SARAA may require insurance in excess of the

minimum required by the PUC of common carriers seeking a license, there seems to be no actual disagreement. The Public Utility Code prescribes minimum levels of insurance coverage for common carriers of passengers by motor vehicles wishing to obtain or retain a certificate of public convenience. However, the PUC readily acknowledged that its authority is not exclusive, noting that the Pennsylvania Insurance Department and the Pennsylvania Department of Transportation also have jurisdiction over motor vehicle insurance with respect to the rates to be charged for insurance and the level of insurance required for vehicle registration. The PUC concluded as follows:

> The Commission does not have *exclusive* jurisdiction over insurance requirements for holders of a certificate of public convenience to render call or demand service. This is not to say, however, that [SARAA], a joint municipal authority whose purpose is to own and operate one or more airports, has any jurisdiction at all with respect to insurance requirements for entities such as [Capital City]. Any power [SARAA] may have over insurance requirements imposed on [Capital City] arises from contract, not from statute or regulation.

Initial Decision at 16 (emphasis original).

The PUC argues in its brief that insurance requirements should be uniform. However, this position goes far beyond what the PUC actually concluded, namely, that insurance requirements in excess of the statutory minimum are a matter of contract not regulation.

## CONCLUSION

The PUC does not care for the Exclusive Agreement between SARAA and American Taxi; however, it did not find that the contract violates any provision of the Public Utility Code. The PUC's ane-

mic order directs nothing; it merely asserts that it has the right and power to nullify the Exclusive Agreement. In effect, the PUC has rendered a declaratory judgment on the scope of its own authority, concluding that it has the power to advance its notion of sound public policy even though such a power has not been specifically, or expressly, conferred upon it by the General Assembly. It has erred in this judgment. We hold that the PUC lacks authority to direct either SARAA or American Taxi to abandon their respective rights and obligations under the Exclusive Agreement.

For these reasons, the order of the PUC is reversed.

## ORDER

AND NOW, this 21st day of November, 2006, the order of the Public Utility Commission entered December 8, 2005, in the above captioned matter is hereby reversed.