**ALASKA STRUCTURES, INC., Petitioner**

v.

**DEPARTMENT OF GENERAL SERVICES, Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs April 24, 2009.

Decided Aug. 24, 2009.

Robert A. Graci, Harrisburg, for petitioner.

Michael C. Barrett, Sr. Counsel and Harry R. Walter, III, Asst. Counsel, Harrisburg, for respondent.

BEFORE: LEADBETTER, President Judge, SIMPSON, Judge, and FRIEDMAN, Senior Judge.

OPINION BY President Judge LEADBETTER.

Alaska Structures, Inc. (Alaska Structures) petitions for review of the November 3, 2008 order of the Deputy Secretary of the Department of General Services for Administration and Procurement, denying Alaska Structures' protest challenging the award of a contract by the Department of General Services (DGS) to EMS Innovations, Inc. (EMS) for the purchase of eight fifty-bed mobile/portable hospital system units, which are capable of being dispatched to disaster sites for emergency medical care.[1]

Alaska Structures challenges the Deputy Secretary's determination that DGS procured the units through "cooperative purchasing" pursuant to Section 1902 of the Commonwealth Procurement Code (Procurement Code), *as amended,* 62 Pa.C.S. § 1902, not as an "emergency procurement" under Section 516 of the Procurement Code, 62 Pa.C.S. § 516. Alaska Structures also questions DGS' authority to procure the units pursuant to Section 1902 of the Procurement Code and to issue an "emergency" purchase order to encumber and preserve the federal grant before expiration of the grant period. After careful review of the record and the relevant provisions of the Procurement Code and the federal acquisition regulations, the Court concludes that Alaska Structures' arguments are without merit and must be rejected.

**I.**

The record reveals the following rele-

1. By a memorandum opinion and order dated February 17, 2009, the Court denied Alaska Structures' application for an immediate stay of DGS' order pending the petition for review.

vant facts.[2] In September 2006, the United States Department of Health and Human Services (HHS) awarded the Pennsylvania Department of Health, Office of Public Health Preparedness, a federal grant in the amount of $18,776,677 for a "Bioterrorism–Hospital Preparedness Program." Reproduced Record (R.R.) at 224a. In November 2007, HHS extended the 12–month grant period to August 31, 2008, and increased the grant amount to $21,556,281 to provide supplemental funding for "Pandemic Influenza, Medical Surge Capacity and Capability." R.R. at 240a. In March and May 2008, the Department of Health sought HHS' permission to redirect the grant funds "to purchase eight 50–bed mobile hospitals" and also requested further extension of the grant period to August 31, 2009. R.R. at 244a and 257a.

In June 2008, DGS' Bureau of Procurement (Bureau) denied the Department of Health's request that the portable hospital system units be purchased through a no-bid, sole source procurement. The Bureau then issued an Invitation for Bids to procure eight portable hospital system units on behalf of the Department of Health. After Alaska Structures filed a protest raising ambiguities in the Invitation for Bids, the Bureau cancelled the Invitation and denied Alaska Structures' protest as moot on August 8, 2008. In the meantime, HHS issued a notice of award on July 15, 2008, permitting the Department of Health to redirect the funds "towards the purchase of mobile medical facilities" and extending the grant period to August 31, 2009 for "PANDEMIC INFLUENZA SUPPLEMENTAL FUNDS ONLY." R.R. at 261a (emphasis in original).

After cancelling the Invitation for Bids, the Bureau investigated the possibility of purchasing the portable hospital system units through the Federal Disaster Recovery Purchasing Program administered by the General Services Administration (GSA). Under that program, state and local governments are authorized to procure products, services and construction necessary to facilitate recovery from a major disaster, terrorism or nuclear, biological, chemical, or radiological attack from contractors listed in the GSA Schedules, including the Federal Supply Schedule 84 (Schedule 84) ("Total Solutions for Law Enforcement, Security, Facilities Management, Fire, Rescue, Clothing, Marine Craft, and Emergency/Disaster Response").

On August 12, 2008, the Bureau requested a quote for eight fifty-bed portable hospital system units from three contractors listed in Schedule 84: First Line Technology, Global Protection and EMS.[3] First Line Technology declined to submit a quote. On August 15, 2008, Global Protection and EMS each submitted a quote in the amount of $6,642,555.79 and $3,712,525.28, respectively. Determining, in conjunction with the Department of Health, that EMS' quote was the best value, the Bureau prepared a purchase order. At that time, the Bureau believed that it was unlikely to obtain approval of the purchase order from the Office of Gen-

---

**2.** Section 1711.1(e) of the Procurement Code, 62 Pa.C.S. § 1711.1(e), provides that "[t]he head of the purchasing agency or his designee ... may, at his sole discretion, conduct a hearing" on a protest. The Deputy Secretary decided Alaska Structures' protest based on the record without a hearing.

**3.** Neither Alaska Structures nor its subsidiary, Blu–Med Response Systems, was listed as one of Schedule 84 contractors. However, Alaska Structures was listed in the GSA Schedule 78, under which state governments are permitted to purchase emergency and disaster response systems from a contractor listed in Schedule 84.

eral Counsel and the Office of Attorney General before the grant period expired on August 31, 2008. The Bureau accordingly issued an "emergency" purchase order on August 28, 2008, to encumber and preserve the federal funds before the grant period expiration.

Alaska Structures timely filed a protest, alleging, *inter alia,* that DGS limited bid competition by failing to request a quote from Alaska Structures and that the issuance of the "emergency" purchase order was not justified under Section 516 of the Procurement Code. Section 516 authorizes "an emergency *procurement* when there exists a threat to public health, welfare or safety or circumstances outside the control of the agency create an urgency of need which does not permit the delay involved in using more formal competitive methods." [Emphasis added.] The Bureau stayed the procurement proceeding pending Alaska Structures' protest.

The Deputy Secretary denied Alaska Structures' protest. She distinguished "the method of award of the purchase order" and "the method of issuance of the purchase order." Deputy Secretary's November 3, 2008 Decision at 3. She stated that the method of award utilized by the Bureau to purchase the portable hospital system units "was procurement from a [GSA] Federal Supply Schedule" pursuant to Section 1902 of the Procurement Code. *Id.* She determined that DGS properly issued the emergency purchase order to prevent the Department of Health from losing the federal funds due to expiration of the grant period on August 31, 2008. Alaska Structures appealed the Deputy Secretary's decision to this Court. DGS subsequently issued a non-emergency purchase order and notified Alaska Structures' counsel that the second order had been fully executed, approved and sent to EMS and that the order "supersede[d] and

terminate[d]" the previous emergency purchase order. R.R. at 456a.

## II.

■ Alaska Structures first argues that DGS procured the units as an "emergency procurement" without circumstances justifying such procurement under Section 516 of the Procurement Code. Alaska Structures asserts that DGS should not be permitted to invoke Section 516 when any urgent need for emergency procurement was solely due to its poor procurement planning. DGS counters that the procurement was made through cooperative purchasing under Section 1902 of the Procurement Code, not as an "emergency procurement" under Section 516. While conceding that "the federal government extended the deadline for expenditure of the federal grant monies until August 2009," DGS' Brief at 14, DGS characterizes the "emergency purchase order" as merely a funding document specifying materials to be purchased, which was later rescinded and replaced with a non-emergency purchase order.

Article 3, Section 22 of the Pennsylvania Constitution provides that, "[t]he General Assembly shall maintain by law a system of competitive bidding under which all purchases of materials, printing, supplies or other personal property used by the government of this Commonwealth shall so far as practicable be made." Pursuant to this constitutional mandate, all Commonwealth agency contracts must be awarded by competitive sealed bidding "[u]nless otherwise authorized by law." Section 511 of the Procurement Code, *as amended,* 62 Pa. C.S. § 511. Section 1902 of the Procurement Code provides in relevant part:

A public procurement unit may either participate in, sponsor, conduct or administer *a cooperative purchasing agreement* for the procurement of any

supplies, services or construction with one or more public procurement units or *external procurement activities in accordance with an agreement entered into between the participants.* [DGS] is authorized to enter into cooperative purchasing contracts solely for the use of local public procurement units or State-affiliated entities. [Emphasis added.]

The term "cooperative purchasing" is defined as "[p]rocurement conducted by or on behalf of more than one public procurement unit or by a public procurement unit with an external procurement activity." Section 1901 of the Procurement Code, *as amended*, 62 Pa.C.S. § 1901, 62 Pa.C.S. § 1901. An "external procurement activity" is "[a] buying organization not located in this Commonwealth which if located in this Commonwealth would qualify as a public procurement unit" *Id.* Under the definition, "[a]n agency of the United States is an external procurement activity." *Id.*

The federal acquisition procedures are set forth in 48 C.F.R. § 8.405–1(a) and (c)(1), which provides in relevant part:

> (a) Ordering activities shall use the procedures of this subsection when ordering supplies and services that are listed in the schedules contracts at a fixed price....
>
> ....
>
> (c) ... (1) Ordering activities shall place orders with the schedule contractors that can provide the supply or service that represents *the best value.* Before placing an order, an ordering activity shall consider reasonably available information about the supply or service offered under MAS [multiple award schedule] contracts by surveying *at least three schedule contractors* through the GSA Advantage! on-line shopping service, or by reviewing the catalogs or pricelists of *at least three*

*schedule contractors* .... [Emphasis added.]

A determination of best value should be made by considering many factors, such as prices, contractor's past performance, warranty considerations, maintenance availability and delivery terms. 48 C.F.R. § 8.405–1(c)(3). Any "orders placed against the Federal Supply Schedules contracts ... using the procedures in this subpart, are considered to be issued using *full and open competition* ...." 48 C.F.R. § 8.404(a) (emphasis added).

DGS requested a quote from the three Schedule 84 contractors "under the GSA Disaster Recovery Program." R.R. at 1a. After evaluating the quotes, DGS determined that EMS' quote was the best value for the Commonwealth. The Deputy Secretary found, and Alaska Structures does not dispute, that DGS complied with the federal acquisition procedures in purchasing the units. The overwhelming evidence in the record thus establishes that DGS purchased the units through cooperative purchasing from Schedule 84 pursuant to Section 1902 of the Procurement Code.

Further, Alaska Structures' assertion that the chief procurement officer conceded that DGS made the procurement as an "emergency procurement" under Section 516 of the Procurement Code is not supported by the record. In his September 17, 2008 response to Alaska Structures' protest, he clearly distinguished the procurement itself and the subsequently issued purchase order. He stated:

> [T]he initial procurement was actually *not done as an emergency procurement; rather it was a purchase off a GSA Federal Supply Schedule. Such procurements are authorized by Section 1902 of the Procurement Code* .... Since the procurement was from a GSA Schedule, the Bureau followed all re-

quirements set forth in FAR [federal acquisition regulations] 8.405–1....

*The resulting purchasing document from the solicitation of quotes and best value evaluation was an Emergency Purchase Order.* This was done because a portion of the grant funds to be used for the units was going to expire.... If the money had lapsed, the Department of Health would not have been able to obtain sufficient units to provide emergency response and recovery services throughout the Commonwealth. [Emphasis added.]

R.R. at 127a–128a. In his subsequent October 3, 2008 response to the Deputy Secretary's request for additional information, the chief procurement officer reiterated that the procurement itself was not an emergency procurement and that "[o]nly the final document was done as an emergency to meet the August 31, 2008 expiration date to obligate (encumber) the funds." R.R. at 222a.

■ As the Deputy Secretary explained in her final decision:

The DGS Bureau of Procurement prepared a purchase order for the portable hospital bed units based upon the EMS Innovations' quote but there was insufficient time for the order to be reviewed and approved by all necessary Commonwealth approvals before the August 31, 2008 expiration date of the grant. The DGS Bureau of Procurement issued emergency Purchase Order 4300117838 to encumber the funds and authorize EMS Innovations to proceed with performance pending final review and approval of the contract by the Office of General Counsel and Office of Attorney General.

DGS did not award the purchase order pursuant to Section 516 of the Commonwealth Procurement Code, 62 Pa. C.S. Section 516. Rather, the DGS Bureau of Procurement determined that, since funding would be lost if funds were not obligated by August 31, 2008, there was insufficient time for the purchase order to be processed using the normal review and approval process. Accordingly, DGS authorized the issuance of an emergency purchase order.

Decision of Deputy Secretary Anne E. Rung, November 3, 2008, p. 4. In making the primary argument upon which this appeal is predicated, Alaska Structures conflates the procurement process and the payment of chosen contractors. What it fails to acknowledge is the fundamental difference between an emergency *procurement,* which deals with a method of *selecting* a vendor (and operates as an exception to the general procurement rules) and the emergency *purchase order* used here, which served to encumber funds for *payment* of the selected vendor while Commonwealth counsel reviewed the final contracts. Clearly, the purchase order did not fall within the ambit of Section 516.[4] Moreover, once this fundamental distinction is recognized, it becomes unclear how Alaska Structures was in any way harmed by the emergency encumbrance of funds, as opposed to the detriment it suffered

---

4. Alaska Structures acknowledges that specific procedures set forth in Part II, Chapter 6 of the DGS Procurement Handbook must be followed for a procurement of products or services under Section 516 of the Procurement Code, including the chief procurement officer's prior approval on a completed "Emergency Procurement ('EP') Approval Request" form. *See* Appendixes D1–5 and E1–2 to Alaska Structures' Reply Brief. The record shows that none of those procedures was taken in this matter, which further buttresses DGS' position that it did not procure the units as an emergency procurement under Section 516.

from the procurement process, through which another vendor was selected.[5]

▪ Alaska Structures also questions DGS' authority to "bifurcate" the procurement proceeding by initially issuing the emergency purchase order and later rescinding and replacing it with a non-emergency purchase order. In support, Alaska Structures relies on *Susquehanna Area Regional Airport Authority v. Pennsylvania Public Utility Commission*, 911 A.2d 612 (Pa.Cmwlth.2006), which held that as creatures of statutes, agencies may exercise only those powers conferred by statute and " 'cannot, by mere usage, invest itself with authority or powers not fairly or properly within the legislative grant....' " *Id.* at 617 n. 8 [quoting *Commonwealth v. Am. Ice Co.*, 406 Pa. 322, 332, 178 A.2d 768, 773 (1962) ].[6] Once again, Alaska Structures ignores the fact that the initial purchase order was issued after the procurement/selection process was complete.

The only irregularity with respect to that purchase order was that the final contracts had not yet been reviewed and approved by the Office of General Counsel and Attorney General, and its only effect was to encumber the funds from the soon to expire federal grant while that review was effectuated.

▪ It is well-settled that "an administrative agency is invested with the implied authority necessary to the effectuation of its express mandates" imposed by statute. *Dep't of Transp. v. Beam*, 567 Pa. 492, 496, 788 A.2d 357, 360 (2002). Section 321(1) of the Procurement Code, 62 Pa.C.S. § 321(1), grants DGS broad powers and duties to, *inter alia*, "[p]rocure or supervise the procurement of all supplies, services and construction needed by executive agencies and those independent agencies for which [DGS] acts as purchasing agency." DGS' authority to take necessary

---

**5.** We further note that the record fails to establish Alaska Structures' claim that the lack of advance procurement planning by DGS and the Department of Health created the need for the emergency purchase order. HHS approved supplemental funding for pandemic influenza, medical surge capacity and capability in November 2007. In March 2008, the Department of Health requested permission to redirect the funds "to purchase eight 50–bed mobile hospitals" R.R. at 244a. HHS did not approve the request until July 15, 2008. After cancelling the Invitation for Bids after Alaska Structures filed the protest, the Bureau requested quotes from the Schedule 84 contractors on August 12. The record fails to show that DGS' failure to make reasonable efforts to procure the units necessitated the need for the emergency purchase order. Alaska Structures' reliance on *GTECH Corporation v. Department of Revenue*, 965 A.2d 1276 (Pa.Cmwlth.2009), is inapposite. In that case, the Department of Revenue failed to take immediate action on the bid protest and failed to stay contract negotiations pursuant to Section 1711(k) of the Procurement Code, 62 Pa.C.S. § 1711.1(k), which requires a stay of the procurement

proceeding upon filing of a protest "unless and until the head of the purchasing agency ... makes a written determination that the protest is clearly without merit or that award of the contract without delay is necessary to protect substantial interests of the Commonwealth." The *GTECH* Court held that, "[a]n agency cannot invoke the exception when its own violation of the Procurement Code, *i.e.*, its failure to act promptly on the bid protest, has caused the need for the exception." *GTECH*, 965 A.2d at 1287. Unlike in *GTECH*, DGS acted promptly on the protest and stayed the proceeding pending the protest. *GTECH* is factually distinguishable and, therefore, its holding is inapplicable to this case.

**6.** DGS argues that the propriety of the emergency purchase order has been rendered moot because that order was rescinded and replaced with the non-emergency purchase order. We disagree that the issue is moot, because Alaska Structures challenges DGS' authority to do just that—issue an emergency purchase order before contract review is complete and then cure any defect by substituting a subsequent non-emergency order.

steps to preserve the federal funds used to purchase the units was necessarily implied from its broad authority granted by the Procurement Code.

### III.

Alaska Structures next argues that DGS lacked authority to procure the units under Schedule 84 through cooperative purchasing. According to Alaska Structures, Section 1902 of the Procurement Code requires a preexisting written agreement for cooperative purchasing between DGS and GSA because Section 1902 authorizes a procurement unit to participate in a cooperative purchasing agreement "in accordance with an agreement entered into between the participants." DGS posits, on the other hand, that the term "agreement" in Section 1902 refers to an agreement between GSA and GSA Schedule contractors and that DGS was not required to enter into a written agreement with GSA to procure the units from the Schedule 84 contractors.

It is axiomatic that the court must consider, *inter alia*, "[t]he consequences of a particular interpretation" in ascertaining legislative intent. Section 1921(c)(6) of the Statutory Construction Act of 1972, 1 Pa. C.S. § 1921(c)(6). Further, interpretation of a statute by an administrative agency charged with statutory duties "is given controlling weight unless it is clearly erroneous." *Riverwalk Casino, L.P. v. Pa. Gaming Control Bd.*, 592 Pa. 505, 530, 926 A.2d 926, 940 (2007).

GSA "authorizes" and "encourage[s]" state and local government entities "to use GSA's Schedule Ordering Procedures to ensure the benefit of receiving the best value from GSA Schedule contractors" and "to purchase products and services from contracts awarded under . . . Schedule 84." R.R. at 40a, 42a. The Bureau attached to the request for bids a list of supplies necessary for the units and stated that "[t]he prices offered . . . must be in accordance with your offered prices that are listed under the GSA Disaster Recovery Program." R.R. 1a. The way in which cooperative purchase agreements are structured is for one government agency to negotiate contracts with a number of vendors, and then make that vendor list available to other agencies, which can take advantage of the negotiated price terms. This lends support to the argument that, the critical and necessary "agreement" referenced in Section 1902 is that between the sponsoring agency and the vendors, not an agreement between the sponsoring and participating agencies. Even if such an inter-agency agreement were required, we believe that the essentials of an agreement exist where GSA has established the Disaster Recovery Purchasing Program and made it available to state and local agencies like DGS, and that DGS has accepted GSA's offer by its participation and by complying with the required federal acquisition procedures. Finally, nothing in Section 1902 requires that the referenced agreement be in writing,[7] and Alaska

---

7. The Procurement Code defines a "contract" as "[a] type of written agreement . . . for the procurement or disposal of supplies, services or construction and executed by all parties. . . ." Section 103 of the Procurement Code, *as amended*, 62 Pa.C.S. § 103. The Procurement Code, however, neither defines "cooperative purchasing agreement" or "agreement" nor requires an agreement to be in writing. *Compare* the definitions of "medi-

cal assistance provider agreement" and "participating provider agreement," requiring the agreements to be "written agreement[s]." *Id.* Black's Law Dictionary 74 (8th ed. 2004) defines the term "agreement" to include "[a] mutual understanding between two or more persons about their relative rights and duties regarding past or future performances." The term "'agreement,' although frequently used as synonymous with the word 'contract,' is

Structures fails to cite any provision in the federal acquisition regulations requiring GSA to enter into a written agreement with state and local governments before authorizing them to procure products and services from GSA Schedules contractors through cooperative purchasing. We conclude, therefore, that DGS' interpretation of the phrase "in accordance with an agreement entered into between the participants" in Section 1902 is reasonable, and thus entitled to controlling weight. Accordingly, the requirements of Section 1902 have been satisfied.

### IV.

■ Finally, Alaska Structures argues that DGS used cooperative purchasing to circumvent competitive bidding. Section 1908 of the Procurement Code provides:

> Where the public procurement unit or external procurement activity administering a cooperative purchase complies with the requirements governing its procurement of supplies, services and construction, any public procurement unit participating in the purchase *shall be deemed to have complied with the requirements governing its procurement of supplies, services and construction.* Public procurement units may not enter into a cooperative purchasing agreement for the purpose of circumventing this part. [Emphasis added.]

Alaska Structures is not suggesting that GSA failed to comply with the federal regulations in entering into cooperative purchasing contracts with the Schedule 84 contractors. When products and services are procured under the Federal Supply Schedules contracts in compliance with the required procedures, such procurement is considered to have met the "full and open competition" requirement. 48 C.F.R. § 8.404(a). As the Deputy Secretary found, DGS complied with all of the procedures required by 48 C.F.R. § 8.405–1 in procuring the units under Schedule 84. GSA encouraged the state and local governments to procure products or services from GSA Schedule contractors to receive the best value. DGS determined that the quote received from EMS was the best value for the Commonwealth. The record does not support Alaska Structures' argument that DGS purchased the units under Schedules 84 to circumvent the competitive bidding process.

Accordingly, the order of the Deputy Secretary denying Alaska Structures' protest is affirmed.

### ORDER

AND NOW, this 24th day of August, 2009, the order of the Deputy Secretary of the Department of General Services for Administration and Procurement in the above-captioned matter is hereby AFFIRMED.

---

really an expression of greater breadth of meaning and less technicality"; thus, "[e]very contract is an agreement; but not every agreement is a contract." *Id.* [quoting 2 Stephen's Commentaries on the Laws of England 5 (L. Crispin Warmington ed., 21st ed.1950)].